

FILED

IN THE UNITED STATES DISTRICT COURT 2004 JUN -9 AM 11: 50
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CLERK US DISTRICT COURT
M.D. OF FLORIDA

| | |
|---|---|
| ALL CHILDREN'S HOSPITAL, INC., ) | |
| WEST COAST NEONATOLOGY, INC., ) | |
| PEDIATRIC PHYSICIAN ) | CASE NO. 8:04 CV 186-T26EAJ |
| SERVICES, INC. and AMBULATORY ) | |
| PEDIATRICS, INC., ) | |
| as assignees of benefits and ) | |
| medical services providers, ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | |
| ) | |
| MEDICAL SAVINGS INSURANCE ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## PLAINTIFFS' MOTION FOR PROTECTIVE ORDER WITH SUPPORTING MEMORANDUM IN OF LAW

Plaintiffs, ALL CHILDREN'S HOSPITAL, INC., WEST COAST NEONATOLOGY, INC.,

PEDIATRIC PHYSICIAN, SERVICES, INC. and AMBULATORY PEDIATRICS, INC.,

("Plaintiffs"), by and through their undersigned counsel, hereby file the instant Motion for

Protective Order with Supporting Memorandum of Law, and as grounds therefore would state:

## BACKGROUND

This is a dispute over more than $800,000 in unpaid medical claims. Plaintiffs are a group

of medical providers that rendered significant healthcare to the Mason Twins as a result of their

premature birth in December of 2001. At the time, the Mason Twins had health insurance through

327380v:1 992477.0002

26

Defendant Medical Savings Insurance Company ("Medical Savings"). After certifying coverage and after Plaintiffs rendered several months of healthcare, Medical Savings unilaterally rescinded the Mason Twins' health insurance coverage and refused to pay the Plaintiffs' bills. [1]

Although the Plaintiffs are all required, by Medicare and other federal law, to charge the same amount for the same services to all payors, they do agree to discount their charges to some insurance companies in exchange for contractually-negotiated promises of prompt payment, volume, and the like. Medical Savings is free to negotiate a provider contract for discounted rates with any Plaintiff, but has chosen instead to unilaterally take discounts it contractually has no right to exact from Plaintiffs. Indeed, in a very recent Business Week article entitled "Making Hospitals Cry Uncle," Medical Savings founder, J. Patrick Rooney proudly confirmed Medical Savings' policy and practice of unilaterally cutting its insureds medical bills. As the article states,

> Medical Savings' routinely marks down its policyholders' hospital bills by as much as 80%. "Yes indeed, we're making unilateral decisions," Rooney says. "But, by God, we have to hold the hospitals down to a reasonable price." Medical Savings tells providers to accept its checks as full payment– or collect from patients.
> * * *
> Rooney [also] says: "The one thing hospitals can't afford is a loss of public trust." And he isn't afraid to get in their faces. "If we go to the hospital and beg they'll say:'We'll give you 20% off, '" says Rooney. Well, phooey– that's still an outrageous price. And we're not going to pay it." Indeed, more than 20 Florida hospital groups–including HCA– are suing Medical Savings for some $7 million in overdue payments.

A complete copy of this article is attached hereto as **Exhibit A**.[2]

---

[1] The legality of this rescission will likely be the subject of dispositive motions.

[2] The statements made by J. Patrick Rooney, Medical Savings' founder and leader, would be admissible as statements by a party against interest.

Despite the fact that this is a hospital claims case over healthcare services rendered to the Mason Twins, Medical Savings has promulgated numerous discovery requests that seek, among other things, copies of virtually all provider contracts between Plaintiffs and other insurance companies and/or to discover that same information through Request for Admissions. The provider contracts requested clearly contain privileged trade secret (and proprietary) information and are also irrelevant to this case since they contain information about the rates paid by other insurance companies to Plaintiffs. Medical Savings has also requested numerous information and admissions about Plaintiffs' costs, but these requests are similarly irrelevant or nonsensical in context. A copy of the expansive discovery requests and responses are attached hereto as **Exhibit B-1 and B-2** (and Plaintiffs respectfully request permission to incorporate them herein by reference). Because Medical Savings' requests clearly seek the disclosure or admission of irrelevant and privileged information, Plaintiffs had no choice but to file the instant Motion for Protective Order.[3]

## LEGAL ANALYSIS

Rule 1 of the Federal Rules of Civil Procedure dictates that the federal discovery rules have but one purpose:

> These rules . . . shall be construed and administered to secure the just, speedy, and inexpensive determination of every action.

Rule 26 of the Federal Rules of Civil Procedure, in turn, gives meaning to Rule 1 in

two important ways. First, the recent amendments to Rule 26(b)(1) narrow discovery

---

[3]More specifically, Plaintiffs assert that Requests for Production #1-10, 18, 19 & 21 and Requests for Admission # 3-10 are objectionable and improper for seeking confidential financial and cost information that is both privileged and irrelevant.

to only those matters relevant to "claims and defenses," instead of the "subject matter" of the applicable action. That is, under the old rule, discovery was permitted of "any matter not privileged, which [was] relevant to the subject matter involved in the pending action, whether it relate[d] to the claim or defenses of the party seeking discovery or to the claim or defense of any other party." Now, however, under the recent amendments to Rule 26 discovery is only permitted "regarding any matter, not privileged, that is *relevant to the claim or defense* of any party . . . (emphasis supplied)." Indeed, the Advisory Committee's note to the 2000 amendment of Rule 26(b)(1) states that the

amendment [was] designed to involve the court more actively in regulating the breadth of sweeping or contentious discovery.

Hence, discovery is no longer permitted simply because it might pertain to the "subject matter involved in the pending action." In this case, Medical Savings has no contractual discount negotiated with the Plaintiffs with respect to their healthcare charges. Under such circumstances, the Eleventh Circuit, as well as other federal and state courts, have routinely held that the contracts negotiated by other insurance companies with the Plaintiffs are completely irrelevant and contain privileged trade secret– and other confidential and proprietary– information. Given the clarity of the case law, Medical Savings' "sweeping" and invasive discovery requests are improper (and can only be intended to harass Plaintiffs).

It is also important to point out that the concept of relevance in Rule 26 is specifically limited to information that is either admissible at trial or "reasonably calculated to lead to the discovery of

327380v:1 992477.0002                     4

admissible evidence." By definition, the Plaintiffs' provider contracts with other insurance companies would neither be admissible nor reasonably calculated to the discovery of such information since the contractual rates and/or discounts negotiated, in good faith, by other insurance companies have no bearing on the charges that Medical Savings (who does not have a contract with Plaintiffs) must pay. Medical Savings must pay Plaintiffs' standard and uniform charges. Indeed, not only would such information be inadmissible, it would actually be an antitrust violation for Medical Savings to even possess that information (and such requests would also make Medical Savings' own insurance policy legally unenforceable). Since the discovery requests propounded by Medical Savings seek documents and information outside of the clear boundaries established by the Federal Rules of Civil Procedure, a protective order should issue.

More specifically, Rule 26©) of the Federal Rules of Civil Procedure provides, in part, that:

©) **Protective Orders.** Upon motion by a party or by the person from whom discovery is sought, accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

(1) that the disclosure or discovery not be had;

(2) that the disclosure or discovery may be had only on specified terms and conditions . . .

In addition, Rule 26(b)(1) of the Federal Rules of Civil Procedure provides, in relevant part, that:

[t]he frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rule shall be limited by the court if it determines that:

(I) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; or

* * *

(iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Because Medical Savings' request for extensive financial and cost information seeks information that is both confidential and irrelevant, Plaintiffs' Motion for Protective Order should be granted.

### A.   *Medical Savings' Requested Rate And Contract Information Is Confidential, Privileged, and Legally Irrelevant Regardless.*

As set forth above, under Rule 26(b)(1) of the Federal Rules of Civil Procedure, only non-privileged information that is relevant to a claim or defense may be discovered. This means that information not relevant to a particular case cannot be sought or discovered by an opposing party. In this case, it is clear that much of the discovery sought by Medical Savings is plainly either privileged or irrelevant (or both) based upon the controlling law and contract and that an appropriate protective order should be issued by the Court.

In HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982, 999 (11th Cir. 2001), the Eleventh Circuit specifically held that a hospital was not bound to give contractually-negotiated discounts to an insurer it had not contracted with, noting that "[g]iven what is usual and customary in the managed care industry, we cannot imagine that even a poorly represented entity would promise to discount its fees in return for nothing." Yet, this is just what

Medical Savings is trying to do by improperly requesting information on rates Plaintiffs negotiated with other insurance companies in exchange for promises of volume or steerage from those companies. The Eleventh Circuit's dictate is clear, having "dismiss[ed] [the health care insurance company's] contention that it is entitled to the benefits of a promise in a contract to which it is not a party and from which it is three times removed." Id. Thus, this Court would simply be following the reasoning of the United States Court of Appeals for the Eleventh Circuit in ruling that Medical Savings is not entitled to the benefits of any other negotiated contract to which it is not a party since Medical Savings is not a party to any contract with Plaintiffs which would yield it the benefit of a discounted reimbursement rate or somehow make any information or admissions on the subject probative of anything in the instant lawsuit. Id. According to the Eleventh Circuit, "[a] prudent person would assume that the fee for a service is the **reasonable, usual and customary fee. He would not even consider the discounted fee because it only arises out of a specified contractual relationship.**" Id., at 997 (emphasis added).

Medical Savings' theory behind asking for all of the Plaintiffs' negotiated discounts seems to be that it should be getting the benefit of such discounts because such discounts reflect the "usual and customary fee"[4] for the Plaintiffs' services. This is not, however, legally correct and has already been rejected by the Eleventh Circuit in the HCA case discussed above. Moreover, in the very recent case of Aetna Life Insurance Co. v. DFW Sleep Diagnostics Center, 2004 WL 465229 (E.D.La.

---

[4]It is important for the Court to note the distinction between "fees" and "charges" in the healthcare context. "Charges" are generally the uniform charges set forth on the claim forms submitted to the insurance company for payment in the matter prescribed by law. "Fees", in contrast, are generally the amounts received by a provider after any applicable discounts are deducted.

2004), a United States District Court specifically refused to compel an answer to an interrogatory relating to just such contracted rate information under a very similar circumstances:

> Interrogatory No. 4 asks for information related to Contracted Providers. As stated earlier, Plaintiff and Defendants do not have a Contract. The Magistrate Judge concluded that the calculation of a negotiated price is affected by factors beyond what is simply a reasonable and customary charge for noncontractual services. The Magistrate Judge was not clearly wrong in making that distinction.

2004 WL 465229 at *5.

Moreover, on April 9, 2004, a New York appellate court held that a patient was not entitled to a discount off a hospital's billed charges and affirmed summary judgment in favor of the hospital-plaintiff for the remainder of its bill. The case of Huntington Hospital v. Abrandt, 2004 WL 829375 (N.Y.App. 2004) is important because it confirms that billed charges are "reasonable" in the absence of a contract providing for some kind of negotiated discount (and that the request for information about such negotiated discounts with other insurance companies is plainly and legally irrelevant). The Huntington Hospital opinion framed the issue as follows:

> This action for services rendered and account stated was brought by plaintiff hospital in June of 2001 to recover the balance due for medical services rendered to defendant Eileen Abrandt in June of 1997. Defendants concede that Ms. Abrandt was treated by plaintiff hospital on the dates in question, but they argued that the charges sought did not represent the fair market value of the services rendered. In opposition to plaintiff's motion for summary judgment, defendants specifically contended that, as an uninsured patient, Ms. Abrandt was not charged the "fair and reasonable" value of the services rendered, inasmuch as the hospital charged different fees for the same services depending upon whether a patient was covered by medical insurance or by government programs such as Medicare or Medicaid. Plaintiff states that all patients were billed at the same rate, but admitted that lesser amounts were accepted as payment in full because of negotiated contracts with third parties and governmental regulations limiting payment.

\* \* \*

In *Flushing Hosp. & Med. Center v. Woytisek*, 41 N.Y.2d 1081, 1082-1083 [1977], the estate of a Blue Cross sought to be billed by the plaintiff hospital at the same rate as Blue Cross, which had contracted with the hospital for a lower rate. The Court of Appeals stated that, "[f]or whatever may be the reasons– volume of payments, promptness in paying, assurance of payment or otherwise– Blue Cross is entitled to what amounts to a very substantial discount with respect to its 50% of the regular charges. The subscriber, however, is not entitled to derive any economic benefit from this independent arrangement between the hospital and Blue Cross."

The fact that lesser amounts for the same services may be accepted from commercial insurers or government programs as payment in full does not indicate that the amounts charged to defendant were not reasonable. (*see Albany Med. Center Hosp. v. Huberly*, 76 A.D.2d 949 [1980]).

The <u>Huntington Hospital</u> opinion holds plainly and unequivocally that the *"fact that lesser amounts for the same services may be accepted from commercial insurers or government programs as payment in full does not indicate that the amounts charged to defendant were not reasonable (emphasis supplied)."* Indeed, the New York appellate court even went so far as to reject the testimony of the patient's expert who suggested, by affidavit, that "a comparison of various contractual cost structures be made in order to determine the 'fair and reasonable' charges for uninsured patients" since the any contractual discounts negotiated by other parties were plainly irrelevant. Thus, summary judgment for the hospital was upheld on the grounds that there was no issue of fact in the case.

Although not  binding precedent, the <u>Huntington Hospital</u> case is important because it confirms standard  healthcare practice that billed charges are "reasonable"in the manner set forth in

more detail in Lefler v. United Healthcare of Utah, Inc., 72 Fed.Appx. 818 (10th Cir. 2003) discussed in more detail below and because it supports the Eleventh Circuit's analysis in the HCA case.  All of these cases confirm that an insurer is not allowed to take discounts it has not contractually negotiated just because a provider may offer discounts to other insurers under other circumstances.

**B.     The Provider Contracts Contain Privileged Trade Secrets And Other Confidential Information.**

Even if Medical Savings' request for provider contracts and cost information were not totally irrelevant, the information would still be protected from discovery as a privileged trade secret or as some kind of confidential business information. A "trade secret" is defined in Florida Statute § 688.002(4) as

> information, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Section 90.506 of the Florida Statutes further provides that

> A person has a privilege to refuse to disclose, and to prevent other persons from disclosing, a trade secret owned by that person if the allowance of the privilege will not conceal fraud or otherwise work injustice. When the court directs disclosure, it shall take the protective measures that the interests of the holder of the privilege, the interests of the parties, and the furtherance of justice require. [5]

---

[5] It is Plaintiffs' position that their provider contracts and discount information would be inadmissible under either federal or state law as being either a trade secret or protected proprietary/confidential information.

327380v:1 992477.0002                                          10

This means that, generally speaking, this Court is first required to determine if the information sought to be protected from disclosure is a trade secret and, if so, protect that information from disclosure. In seeking copies of all of Plaintiffs' provider contracts with other insurance companies and in also seeking admissions related to such information, Medical Savings is clearly seeking proprietary information about the discounted rates at which other insurance companies have arranged contracts with Plaintiffs. Moreover, it must be obvious from the discussion of the Eleventh Circuit's decision in the <u>HCA</u> case discussed above that any discounts negotiated by another insurance company cannot be used by Medical Savings to lower its own claim costs. Medical Savings was free to negotiate with Plaintiffs to contract to lower its reimbursement rates. It is not free, *post hoc*, to try and lower its rates further by piggybacking on the rates paid by other insurance companies that might have provide increased patient volumes in exchange for such lower rates. [6]

Moreover, in <u>Lefler v. United Healthcare of Utah, Inc.</u>, 72 Fed.Appx. 818 (10th Cir. 2003), the United States Court of Appeals for the Tenth Circuit was faced with the issue of whether United Healthcare ("United") had to calculate member co-payments on full billed charges or on discounted rates. The case was brought under ERISA, and the Tenth Circuit held that United could calculate member co-payments on full billed charges based upon the language of its ERISA insurance contracts. The case is seminal on the issue of how "reasonable and customary" charges are calculated in the health care industry. As noted specifically in the opinion,

> Borrowing established Medicare practice, United routinely considered full billed

---

[6] The fact that provider contracts (and the reimbursement rates contained therein) constitute trade secrets and/or confidential information is clearly established by instructive Florida law. <u>See</u> for example, Florida Statutes § 395.305 (making provider contracts with public hospitals and other reimbursement documents exempt from public records law); § 408.185 (making provider contracts submitted to government for anti-trust review confidential and exempt from disclosure).

charges submitted by participating providers to be "reasonable and customary charges" under the plan. In support of this practice, it filed an affidavit from Dr. William Cleverly, an expert in the health care industry. According to Dr. Cleverly, hospitals submit a standard charge for services to insurers and other payors on a form used industry-wide and generated by the federal Health Care Financing Administration (HCFA), which administers the Medicare program. But those standard charges are typically discounted in accordance with individual contracts negotiated between payors and service providers. Under Medicare, for example, the patient's percentage co-payment is calculated against the full billed charge, even though Medicare pays the hospital a reduced fee set by government regulation and tied to a provider's reasonable cost.

United also submitted the affidavit of Terry Cameron, a consultant for health care providers, who stated individual physicians also submit standard charges on a widely used HCFA form. Like hospital fees, these charges are based on a uniform schedule even though the amounts the physicians actually receive often vary according to the payor. According to Mr. Cameron, the standard charges are fed into databanks maintained by the Health Insurance Association of America (HIAA) and others, and used to compile information on reasonable and customary charges around the country. Significantly, in her deposition, Class expert Mary Covington, an insurance claims auditor, pointed out that United considers any charge at or below the eighty to eighty-fifth percentile of the HIAA schedules to be "reasonable and customary." Charges above the eighty to eighty-fifth percentiles were considered ineligible.

72 Fed.Appx. at 821. The <u>Lefler</u> opinion is extremely important because it outlines, in detail, the fact that full billed charges are the baseline for health care charges and because it establishes this baseline by using an insurance company's own hand (and expert). Interestingly, United's members tried to argue that full billed charges were not "reasonable and customary" because they exceeded "the fees that the provider would charge any other payor for the same service." The Tenth Circuit rejected this argument, noting that the

Class's suggested interpretation of "reasonable and customary charge" demands a comparison [among negotiated discounts]. As the district court ably pointed out, it is impossible to compare other payor-provider negotiated rates because of the propriety and confidential nature of such competitor agreements. In the absence of this information, the Class could never be assured United's negotiated rate did not exceed another insurer's negotiated rate. Since the Class interpretation of the

327380v:1 992477.0002

12

Certificate, offered to rebut the reasonableness of United's interpretation, would result in impossibility of contract performance due to the inability to compare other negotiated rates, the district court rightfully favored United's position.

72 Fed.Appx. at 825.

The Tenth Circuit also went on to specifically hold:

> [[w]e conclude United's interpretation of the Certificate language was a reasonable one [under ERISA]. Considering a health service provider's full billed charge to be "reasonable and customary" harmonizes well with Medicare practice, an identical procedure explicitly approved by state regulators in Minnesota, and with the Certificate requirement [that] the charge of the provider cannot exceed charges to any other payor for like services.

*Id.*  The holding is extremely explicit and specifically confirms a "health service provider's full billed charges to be 'reasonable and customary'" in the absence of a contract between the parties. This is exactly what Plaintiffs' charged Medical Savings. The fact that the <u>Lefler</u> analysis was actually propounded by an insurance company makes this case doubly valuable, ***especially when one considers that United Healthcare's position was premised on the acknowledgment that the possession of another company's provider contracts would amount to an antitrust violation***. Even though <u>Lefler</u> is technically an ERISA case, the holding is good precedent on the workings of healthcare contracts and on the reasonableness of full, billed charges as a starting point in assessing the correctness of provider reimbursement levels in both the contracted and non-contracted settings. Thus, Medical Savings' requests for provider contracts and reimbursement discount information (and any requests for admission related thereto) are clearly protected from disclosure, and should be prohibited by the Court.[7]

---

[7]Because the law is so clear and because release of the knowledge could be so competitively injurious, it is Plaintiffs' position that no *in camera* inspection of the requested contracts, rate, or cost information should even be necessary. Both sides must admit that the provider contracts contain information about negotiated discount rates between Plaintiffs and other insurance companies. To give such competitive information to Medical Savings would

The Lefler case is also important because it acknowledges that an insurance contract which is tied to some kind of reference to discounts negotiated with other parties would be impossible to perform because, as the Tenth Circuit explained with approval: "As the district court ably pointed out, it is impossible to compare other payor-provider negotiated rates because of the proprietary and confidential nature of such competitor agreements." 72 Fed.Appx. at 825. This means that, not only is the discount and other contract information requested by Medical Savings' proprietary and undiscoverable, but Medical Savings' own insurance policy– to the extent it could be interpreted to require reference to such "payor-provider" negotiated rates-- would be plainly unenforceable as well.[8]

### C.    The Cost and Rate Information Sought By Medical Savings Is Also Irrelevant Under Florida Law.

In the absence of any agreement or commitment from Medical Savings as to volume, payment terms, or other consideration, Plaintiffs could not, and did not, agree to provide any "discount" off their billed charges to Medical Savings.   Florida's statutory scheme s clear that, in the absence of a contract, Florida Statutes require Medical Savings to pay Plaintiffs' full, *billed* charges.  See §641.3154(4) Fla. Stat.; §641.3 155(3)(e) Fla. Stat.; §641.3155(1) Fla. Stat.

---

be tantamount to giving a competitor the information about prices given to other customers and would also likely be prohibited from disclosure under the confidentiality provisions of the contracts themselves regardless. Moreover, even giving Medical Savings the names and parties to other insurance contracts in a privilege log would – simply standing alone-- give over significant confidential business information to Medical Savings. This should not be sanctioned by the Court as the requests for other provider contracts and cost information and admissions plainly seek irrelevant and privileged information. Given the obviousness of the issue, there is simply no need for the Court to hold an *in camera* inspection of Plaintiffs's provider contracts and other confidential material in this case. However, should the Court be inclined, at all, to order the release of such information, Plaintiffs respectfully request that the Court review the material *in camera* first.

[8]To the extent that Medical Savings wishes to compare Plaintiffs' billed "charges" (as opposed to its discounted fee schedule applicable to other insurers) with other providers billed charges, that information is collected by national vendors such as the HIAA and would not normally be in Plaintiffs' possession anyway.

Medical Savings has failed to pay Plaintiffs' their billed charges. These are the uniform charges that Plaintiffs are required, by law, to charge to every payor. Medical Savings' position, in effect, is that it can pay whatever it feels like paying. This is confirmed by the statements of Medical Savings' own President and Founder in the Business Week article quoted above (and attached as **Exhibit A**) wherein he admits that Medical Savings takes unilateral discounts on hospital charges. This is impermissible under *any* principle of contract or business law, but more importantly for purposes of this motion, it is contrary to Florida's express statutory scheme. Like any other business in a free-market economy, Plaintiffs are entitled to be paid at the rate they elects to charge for its services, and not at the rate that someone else dictates. A consumer cannot go into a department store and unilaterally declare that he is going to pay $1 for a brand new suit and expect to leave the store with the suit without being accused of theft, yet Medical Savings is doing just that by unilaterally discounting Plaintiffs' fees by as much as 80 percent. See **Exhibit A**.

The question of what rates govern payment for Plaintiffs' healthcare services is answered in Florida's statutory scheme regulating health insurers. Florida Statute § 641.513 provides that, in the absence of a contract, insurance companies must pay a providers "charges" as set forth on their claim forms. See also Florida Statute sections 641.3154(1), 641.3155(3)(e). The term "claim" is defined as a HCFA-1500 or UB-92 data set. See Florida Statute §§ 641.3155(1), 627.6131(2). These are the government-mandated claim forms that all providers must use when sending out claims for payment. Medical Savings is, therefore, obligated to pay Plaintiffs' claims as represented by Plaintiffs' HCFA 1500/UB-92 forms submitted for medical services. Plaintiffs' claim forms reflect their billed charges. That is the amount owed by Medical Savings under Florida's statutory scheme.

Medical Savings' will undoubtedly argue that Florida's statutory scheme is inapplicable here

because it is not technically a PPO or an HMO, but this argument really misses the point. In addition to the statutes quoted above, the Florida Statutes refer to "provider charges" something like an additional ten or eleven times and all in the context of a  provider's "charges." Moreover, in Sheridan Healthcorp v. Blue Cross , the Dade County Circuit Court recently granted summary judgment to Sheridan (an anesthesia healthcare provider), specifically finding that, in the absence of a contract:

> the reasonable value of Sheridan's services  .   .   .   are its billed rates.  It is undisputed that Sheridan submits claims to all insurers, including Defendants, which uniformly contain its billed charges.  It is also undisputed that Defendants knew Sheridan would charge Defendants its full, non-discounted billed charges upon the 12/31/01 termination of the [parties'] contract  .   .   .   It would be plainly inappropriate to hold Sheridan to the terms of the contract, which both sides agree, was no longer in effect.

A copy of this opinion is attached hereto as **Exhibit C** for the Court's convenience.[9]

### D.   *Plaintiffs' Reserve the Right to Proffer Additional Objections to the Discovery Requests At Issue.*

Plaintiffs expect that, should Medical Savings decide to file its own motion to compel with respect  to the separate discovery requests that are the subject of this Motion to Compel, that each discovery request at issue will be discussed serially (and Plaintiffs reserve the right to do this, as necessary at a later date), although the propriety of many of  the requests will be determined by the Court's ruling as to the trade secret and other relevancy objections raised herein. Thus, Plaintiffs have not reasserted their  form objections to many of the ambiguous, argumentative,  or compound discovery requests promulgated by Medical Savings here since those form objections are expected to be resolved in more detail, as necessary, through the filing of an opposition to an expected motion

---

[9]Plaintiffs wish to make the Court aware that the summary judgment granted to Sheridan Healthcorp in its case again Blue Cross was later vacated pursuant to the settlement of the parties therein. However, it is Plaintiffs' position that the opinion remains good law and a good exposition of Florida's statutory scheme with respect to a provider's billed charges being reasonable in the absence of a contract.

to compel at a later date (should such become necessary). Plaintiffs hope, however, that this will not

be necessary, and are requesting that the protective order be decided now because of the importance

of the issues raised herein.

## CONCLUSION

FOR ALL THE FOREGOING REASONS, Plaintiffs respectfully request that the Court grant

their Motion for Protective Order.  Both Florida statute and case law preclude the production of

provider contracts as trade secrets and/or confidential information  and that information is irrelevant

under the law regardless since any discounts negotiated by Plaintiffs with other insurance companies

are plainly irrelevant to what Medical Savings must pay here since it has chosen not to negotiate its

own contract with Plaintiffs. For the same reasons, Plaintiffs' cost information would be protected

as well. In the HCA case, the Eleventh Circuit has made it perfectly clear that an insurance company

is not "entitled to the benefits of a promise in a contract to which it is not a party and from which it

is three times removed." Similarly, in Lefler v. United Healthcare, the Tenth Circuit held that "it is

impossible to compare other payor-provider negotiated rates because of the proprietary and

confidential nature of such competitor agreements." This means that the contract, cost, and discount

information sought  by Medical Savings in its discovery requests is both irrelevant and protected

from disclosure. Hence, Plaintiffs have not one, but two separate and sufficient grounds supporting

their request for protection here.

WHEREFORE, Plaintiffs respectfully  request: 1) that this Honorable Court grant their

Motion for Protective Order; 2) that the Court order Defendant Medical Savings to pay the costs and

attorneys' fees incurred  in having to file their Motion for Protective Order as set forth in Rules 26

and 37 of the Federal Rules of Civil Procedure; 3) that the Court accordingly  limit the scope of the

discovery in this case to contracts, claims, and information relating solely to the subject matter of

this litigation and specifically preclude the production of outside provider contracts and other

reimbursement or cost information or, in the alternative, that the Court hold an *in camera* inspection

of any materials it believes might hold trade secrets or other confidential business information; and,

4) that the Court grant such other and further relief as this Court deems just and proper.

### Good Faith Certification

The undersigned hereby certifies that counsel for Defendant was contacted about agreeing to the relief requested herein, but did not respond (and these same issues have arisen between the parties before without resolution).

### Certificate of Service

I HEREBY CERTIFY that a true copy of the foregoing was furnished via U.S. Mail to: Alan D. Stewart, Esquire, BUTLER, PAPPAS, WEIHMULLER, KATZ CRAIG, LLP, Attorneys for Defendants, Bayport Plaza, Suite 1100, 6200 Courtney Campbell Causeway, Tampa, Florida 33607 this _____ day of June, 2004.

TRIPP SCOTT, P.A.
*Attorneys for Plaintiff*
110 Southeast 6th Street, 15th Floor
Fort Lauderdale, Florida 33301
TEL.: (954)525-7500
FAX: (954)761-8475


STEPHANIE ALEXANDER
Florida Bar # 00810178



Close Window

JUNE 7, 2004

PEOPLE

# Making Hospitals Cry Uncle
### Has insurer J. Patrick Rooney found an unorthodox way to turn up the heat?

Conservative millionaire J. Patrick Rooney is on a mission from the Almighty: Bring down crushing and "ungodly" health-care costs. For more than a decade, he has worked to replace traditional insurance with tax-free health savings accounts (HSAS), which people can use to pay for their own medical care. "I'm doing the right thing, and I think the Lord will be pleased about it," he says.

Using his fortune to open doors in Washington, Rooney has relentlessly preached his gospel. Last year, Congress saw the light: GOP lawmakers inserted a $6.4 billion tax break for HSAs into a Medicare prescription-drug bill. And a recent survey by Mercer Human Resource Consulting says 75% of employers are likely to offer the accounts by 2006.

A courtly 76-year-old, Rooney has never hidden the fact that he stood to profit from his crusade. After pioneering HSA sales with his old company, Golden Rule Insurance, he sold out to UnitedHealth Group Inc. (UNH ) for $893 million just before Congress passed the tax break. He promptly founded Medical Savings Insurance Co. to sell more HSAs.

## PR HARDBALL
But Rooney isn't relying on just the power of his ideas and political connections to make his company profitable. The Indianapolis-based insurance entrepreneur also is backing a nonprofit group that uses hardball tactics to get hospitals to cut prices. The nonprofit, called Consejo de Latinos Unidos, campaigns on behalf of uninsured Hispanics.

Last year, Consejo pressured the nations' No. 2 hospital system, Tenet Healthcare Corp. (THC ), to cut rates for uninsured patients and revamp its collection practices. At the same time, Rooney's Medical Savings won about $2 million in debt forgiveness from Tenet.

Now, Consejo's leader, Republican strategist K.B. Forbes, has turned his attention to Florida. Hospitals being pilloried there say Rooney's company owes them millions in unpaid bills, too. And Rooney has suggested that a new Consejo target -- HCA Inc. (HCA ), America's largest hospital operator -- could take a lesson from Tenet and shake its bad press by cutting a deal to forgive Medical Savings' debts.



EXHIBIT A

Rooney, who pledged seed money to Consejo and hired a Washington public relations firm to draw attention to its cause, says he doesn't control Forbes. "K.B. has to paddle his own canoe," Rooney says. Besides, says Rooney, his drive to cut health-care costs, especially hospital fees, is about more than money: It's a moral crusade. As such, he makes no apologies for unorthodox methods.

## ARM-TWISTING?

That includes backing Forbes, a onetime Medical Savings employee. "Forbes presents himself as an advocate of the consumer," says Linda S. Quick, president of South Florida Hospital & Healthcare Assn. But Consejo "seems to be initiated and financed by Rooney and others selling individual insurance."

With his folksy demeanor, Rooney comes across as an endearing do-gooder. He is also one of the most powerful voices on the Right. Since he pioneered HSAs in 1990, Rooney, his family, and employees have poured more than $5 million into Republican causes.

Rooney's new model of health coverage, which has won support from President George W. Bush, replaces traditional insurance with tax-free health savings accounts and high-deductible policies. The argument: If patients must pay out-of-pocket for, say, the first $1,000 in bills, they will seek more cost-effective care. That, Rooney maintains, will unleash market forces to hold down costs. Big insurers, including Aetna Inc. (AET ) and many regional Blue Cross Blue Shield Assn. plans, began rolling out HSAs this year.

For hospitals, the plans pose a threat: bad debts. Patients accustomed to first-dollar coverage find they must pay before insurance kicks in, and many don't. In April, HCA blamed a rising tide of unpaid bills for its soft first quarter.

It's not just patients who aren't paying. Medical Savings routinely marks down its policyholders' hospital bills by as much as 80%. "Yes indeed, we're making unilateral decisions," Rooney says. "But by God, we have to hold the hospitals down to a reasonable price." Medical Savings tells providers to accept its checks as full payment -- or collect from patients.

But as Forbes has demonstrated, hospitals pursuing low-income patients are vulnerable to attack. Last year, Consejo stoked press coverage of poor patients being hunted down by bill collectors. "Nobody wants these cases where someone was sick and the big, bad hospital is suing them," says Richard Morrison, a vice-president at Orlando's Adventist Health System, which says Medical Savings owes it some $1 million.

Consejo zeroed in on Tenet in 2001 after Forbes uncovered examples of bare-knuckle collection practices -- such as a lien on a Louisiana patient's beat-up mobile home. His timing was perfect. Tenet was trying to acquire hospitals in four cities and had drawn fire from the feds over its Medicare billing. At critical junctures, Forbes would trot out patients to portray Tenet as intent on gouging the poor. Tenet lost three of the acquisition deals.

Behind the scenes, Tenet was in talks with Medical Savings over its unpaid bills. In January, 2003, Tenet caved. It forgave nearly all of Medical Savings' debt and lowered prices for the uninsured. In return, Consejo dropped 10 lawsuits. The deals with Consejo and Rooney were "contemporaneous and simultaneous," a Tenet executive says.

Like Tenet, HCA has sought a truce. In mid-2003, Chairman and CEO Jack O. Bovender Jr. set up a meeting with Rooney to explain HCA's discount policy in hopes that Rooney would persuade Forbes to back off. But prior to the meeting, Rooney forwarded a memo to Bovender from Medical Savings President Randy Suttles that drew parallels between HCA's situation and Tenet's. In the memo, which HCA made available to *BusinessWeek*, Suttles notes that Tenet had shaken some of its bad press after making a deal with Medical Savings. "HCA is in similar circumstances," Suttles wrote. A livid Bovender canceled the meeting.

When asked about the e-mail to Bovender, Rooney says: "The one thing hospitals can't afford is a loss of public trust." And he isn't afraid to get in their faces. "If we go to the hospital and beg, they'll say: 'We'll give you 20% off,'" says Rooney. "Well phooey -- that's still an outrageous price. And we're not going to pay it." Indeed. More than 20 Florida hospital groups -- including HCA -- are suing Medical Savings for some $7 million in overdue payments.

HCA and other Florida hospitals figure they have better odds of bucking Forbes and Rooney than Tenet did: They're not under serious regulatory scrutiny, and they're moving to help the uninsured. Rooney paints a different picture, saying hospitals are lining up to deal: "Tenet is not the only one." Both he and Forbes -- independently, of course -- predict victory.


By Lorraine Woellert in Washington



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALL CHILDREN'S HOSPITAL, INC.,
WEST COAST NEONATOLOGY, INC.,
PEDIATRIC PHYSICIAN
SERVICES, INC. and AMBULATORY
PEDIATRICS, INC.,
as assignees of benefits and
medical services providers,

CASE NO.: 8:04 CV 186 T26 EAJ

      Plaintiffs,

v.

MEDICAL SAVINGS INSURANCE
COMPANY,

      Defendant.
_____/

## DEFENDANT'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

    Defendant, Medical Savings Insurance Company ("Medical Savings"), pursuant to

Federal Rules of Civil Procedure, requests that each named Plaintiff, furnish copies of the

documents set forth in the Annexed Exhibit "A," to the offices of the undersigned attorney

within thirty (30) days from the date of service hereof. If any document is withheld on the

grounds of privilege, you are directed to state the privilege and to identify the document by

stating its date, the author, the person to whom it was sent or directed, and its custodian.

# EXHIBIT B-1

BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP

_Alan D. Stewart_

ALAN D. STEWART, ESQ.
Florida Bar No.:  0108431
Bayport Plaza, Suite 1100
6200 Courtney Campbell Causeway
Tampa, Florida  33607-5946
Telephone:   (813) 281-1900
Facsimile:    (813) 281-0900
Attorneys for

## CERTIFICATE OF SERVICE

I certify that a copy hereof has been furnished to:

Stephanie Alexander, Esq.
Tripp Scott, P.A.
110 Southeast 6th Street, 15th Floor
Fort Lauderdale, FL  33301

by U.S. Mail on May___3___, 2004.

_Alan D. Stewart_

ALAN D. STEWART, ESQ.

2

## DEFINITIONS

A.      "Plaintiff" means each entity named as Plaintiff in the caption of this action, or any agent or any other person or persons acting or purporting to act on each entity's behalf.

B.      "Each Plaintiff" for purposes of this Request For Production, means "any and all Plaintiffs," possessing documents responsive to the Request.

C.      "Medical Savings" means Defendant, Medical Savings Insurance Company.

D.      "Documents" means tangible things and also the original and identical copies (including xeroxed and photographically reproduced, or otherwise duplicated copy), and any non-identical copy (which is different from the original because of notations on such copy or otherwise), of all correspondence, telegrams, teletype messages, contracts, agreements, proposals, minutes, agenda, memoranda, diary entries, tapes, recordings, transcripts or any other record of any statements, meetings, discussion or consideration, books, reports, analyses, audits, working papers, projections, photographs, investigative reports, graphs, charts, financial records, computer print outs, ledgers, brochures, envelopes, development plans, Rolodex or other files or file folders, computer discs and models, email, drafts, discards or revisions of any of the above, and all of any nature whatsoever, together with any attachments thereto or enclosures therewith, and also mechanical, electrical or electronic transcription of words, numbers or information in any other form or kind and description in the actual or constructive possession, custody, care or control of each Plaintiff or those over who it exercises control.

E.      "Relating to" means consisting of, referring to, reflecting or in any way logically or factually connected with the matter discussed. A document "relating to" a given subject is any document identifying, referring to, dealing with, evidencing, commenting upon, having as a subject, describing, summarizing, analyzing, explaining, detailing, outlining, defining, interpreting, or pertaining to that subject, including, without limitation, documents referring to the presentation of other documents.

3

## EXHIBIT "A"

## DOCUMENTS TO BE PRODUCED

1.  Medicare Cost Reports pertaining to each Plaintiff for calendar years 1996 through 2002 inclusive.

2.  All documents related to or which evidence the actual cost to each Plaintiff for all drugs, medicines, supplies and other tangible items that are the subject of all charges at issue in this case.

3.  All preferred provider agreements, health maintenance organization contracts, managed care contracts, health service organization contracts to which each Plaintiff was a party and which were in force on the dates of hospitalization and treatment of the Mason twins.

4.  All documents related to or which evidence each Plaintiff's private-pay rate for the services and supplies provided to the Mason twins, for the time period of their hospitalization and treatment.

5.  Any documents related to or which evidence how much Blue Cross/Blue Shield or any other health service corporation or health maintenance organization would have been billed, after contractual or revenue adjustments, for medical services and supplies that are identical to those provided by each Plaintiff to the Mason twins, during the time period of their hospitalization and treatment.

6.  Any documents related to or which evidence the amount each Plaintiff charged to an uninsured individual for the services and supplies provided to the Mason twins during the time period of their hospitalization and treatment.

7.  Any documents related to or which evidence any comparison of each Plaintiff's charges to charges of other health care providers including, but not limited to, any reports or price comparisons prepared by employees, agents and consultants of each Plaintiff.

8.  Reports, worksheet, memoranda, budgets, and financial projections prepared by or for each Plaintiff that analyze, tabulate, recommend or justify charges for services, drugs or supplies on its "chargemaster" or for any changes, including overall percentage increases or decreases, to the chargemaster during calendar years 1997 through 2001.

9.  Written communications of each Plaintiff or any of its affiliated hospitals or subsidiaries related to pricing practices, price increases, changes to the chargemaster specific prices or general chargemaster price levels.

4

10.    Any memos, analyses, reports, written projections or discussions related to health care "cost shifting."

11.    Any written communications between each Plaintiff and any health care providers, consultants, employees, agents and any other individuals related to Medical Savings Insurance Company including, but not limited to, its claims payment practices or procedures and pre-certification practices or procedures.

12.    All documents related to or which evidence communications between each Plaintiff and the parents of the Mason twins.

13.    All documents related to or which evidence any agreements or contracts between each Plaintiff and the either the Mason twins and/or their parents.

14.    All documents related to each Plaintiff's collection practices and procedures including, without limitation, compliance with the Fair Debt Collection Practices Act.

15.    All documents related to any bonus or compensation program applicable to each Plaintiff's agents and employees who engage in billing or collection activities for each Plaintiff.

16.    Copies of all contracts, agreements, and correspondence pertaining to contracts and agreements, between any Plaintiff and other entities, concerning the granting of exclusive, and non-exclusive, rights to do business in certain geographical portions of the State of Florida.

17.    All articles of incorporation, with amendments currently in effect, pertaining to each corporate Plaintiff.

18.    Copies of all corporate minutes that include any reference to pricing practices, price increases, changes to the chargemaster specific prices or general chargemaster price levels, "cost shifting," and comparisons of each Plaintiff's charges to charges of other health care providers.

19.    Copies of all corporate resolutions that refer in any way to pricing practices, price increases, changes to the chargemaster specific prices or general chargemaster price levels, "cost shifting," and comparisons of each Plaintiff's charges to charges of other health care providers.

20.    Copies of all corporate minutes and corporate resolutions that include any reference to the hospitalization, treatment, and charges for hospitalization and treatment of the Mason twins.

21.   Copies of all corporate minutes and corporate resolutions that include any reference to rates charged to Medicare patients, private-pay patients, health maintenance organization patients, and health service corporation patients.

22.   Any and all written or recorded statements taken from any of the Defendants, their agents and/or employees, concerning any issue in this cause.

23.   Any and all insurance applications, and insurance policies providing benefits for or coverage of any condition affecting the health of Nancy Mason and John Mason, Jr., for the time period of March 7, 1991 through and including the present.

24.   Copies of any or all applications, pleadings, discovery, or other materials compiled pertaining to any lawsuit, employment disability claim and social security disability claim involving the Nancy Mason and/or John Mason, Jr.

25.   All written statements, including opinions, memoranda and reports of each Plaintiff and Plaintiff's agents and employees which each Plaintiff expects to introduce into evidence at the  trial of this cause.

26.   All written statements, including opinions, memoranda and  reports, of any and all witnesses, including treating practitioners and experts, which each Plaintiff expects to introduce into evidence or utilize at the trial of this cause.

27.   Any and all writings, of any kind, identifying and pertaining to insurance agents and companies from which Nancy Mason and John Mason, Jr. sought and/or received insurance coverage during the time period of March 7, 1991 to and including the present date;

28.   Any and all writings, of any kind, identifying insurance coverage provided to Nancy Mason and/or John Mason, Jr., covering the time period of March 7, 1991 to and including the present date;

29.   Any and all applications for insurance ever completed by Nancy Mason and/or John Mason, Jr., seeking coverage of Nancy Mason for the time period from March 7, 1991 to and including the present date;

30.   Any and all medical records, hospital records, and other records, including billing and proof of payment of bills, concerning medical treatment sought by, and received by Nancy mason during the time period of March 7, 1991 to and including the present date;

31.   Any and all non-privileged writings pertaining to claims made by or on behalf of Nancy Mason for medical conditions and/or injuries during the time period of March 7, 1991 to and including the present date;

6

32.  All writings, records, and other documents provided to Defendant prior to or on March 7, 1991, informing Defendant of any medication being taken by Nancy Mason during February 2001 or March 2001, or of any medical treatment received by Nancy Mason during February 2001 or March 2001.

33.  All writings, records, and other documents provided to Defendant prior to or on March 7, 1991, informing Defendant of any prior indication by, diagnosis of or treatment of Nancy Mason, between March 7, 1991 and March 7, 2001, for:

(a)  any disease or disorder of the female reproductive organs, including records of irregular menstruation, abnormal pap test;

(b)  any blood abnormalities, including cholesterol or triglyceride abnormalities; and

(c)  diabetes, sugar in the urine, blood, thyroid, breast (such as fibrocystic breast disease) or other gland disorders

34.  All writings, records, and other documents provided to Defendant prior to or on March 7, 1991, informing Defendant that between March 7, 1996 and March 7, 2001, Nancy Mason or John Mason, Jr. had discussed or had been advised to have testing, consultations or surgery.

35.  All writings, records, and other documents provided to Defendant prior to or on March 7, 1991, informing Defendant of any testings, consultations or surgery that had not been completed by Nancy Mason or John Mason, Jr.

36.  Copies of all medical and prescription records of Nancy Mason, for the time period between March 7, 1991 and March 7, 2001.

37.  Copies of all medical authorizations, releases and other writings provided by Nancy Mason and John Mason, concerning their own medical history and treatment, and concerning the medical history and treatment of their twin children.

38.  Copies of all correspondence, and other records of communication, between each Plaintiff and Nancy Mason, and between each Plaintiff and John Mason, Jr.

39.  Copies of all agreements entered into by each Plaintiff and Nancy Mason.

40.  Copies of all agreements entered into by each Plaintiff and John Mason, Jr.

41.  Copies of all agreements entered into by each Plaintiff and either parent of the Mason twins, on behalf of either or both of the Mason twins.

7

42.   Copies of all documents signed by either Nancy Mason or John Mason, Jr., in connection with all medical care for which payment is now sought by Plaintiffs from Defendant.

43.   All writings, diagrams, videotapes, audiotapes, transcripts and other material that support the allegations set forth in the Plaintiffs' Complaint

44.   Copies of all writings written retainer agreements executed by Nancy Mason, and by John Mason, Jr., in connection with legal representation of her:

(a)   in this lawsuit; and

(b)   with respect to all claims pertaining to the payment of charges for medical and hospital care rendered to the Mason twins.

45.   Copies of all writings written retainer agreements executed by or on behalf of each Plaintiff, in connection with legal representation:

(a)   in this lawsuit;

(b)   with respect to all claims pertaining to the payment of charges for medical and hospital care rendered to the Mason twins;

(c)   with respect to all claims pertaining to the collection of payment of hospital charges reflecting treatment of patients who are:

(1)   private-pay patients;

(2)   covered by a health maintenance organization contract;

(3)   covered by managed care contracts;

(4)   covered by a health service organization contract.

46.   Copies of all correspondence, writings, appointment slips, appointment cards, pamphlets, prescriptions, prescription bottle labels, and other material pertaining to Nancy Mason from any and all medical, hospital, radiologic and diagnostic practitioners between March 7, 1991 and March 7, 2001.

47.   Copies of all checks received by Nancy Mason or by John Mason, Jr., from Medical Savings Insurance Company, or from Edgar R. Lantis.

48.   Copies of all bank statements that indicate the cashing or deposit of all checks received by Nancy Mason or by John Mason, Jr., from Medical Savings Insurance Company, or from Edgar R. Lantis.

8

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALL CHILDREN'S HOSPITAL, INC.,
WEST COAST NEONATOLOGY, INC.,
PEDIATRIC PHYSICIAN                         CASE NO.: 8:04 CV 186 T26 EAJ
SERVICES, INC. and AMBULATORY
PEDIATRICS, INC.,
as assignees of benefits and
medical services providers,

   Plaintiffs,

v.

MEDICAL SAVINGS INSURANCE
COMPANY,

   Defendant.
_____/

## NOTICE OF SERVICE OF DEFENDANT'S REQUEST FOR ADMISSIONS, INTERROGATORY, AND REQUEST FOR PRODUCTION BY EACH PLAINTIFF

COMES NOW the Defendant, MEDICAL SAVINGS INSURANCE COMPANY, by and through its undersigned counsel, and pursuant to the Federal Rules of Civil Procedure, and requests that each Plaintiff, ALL CHILDREN'S HOSPITAL, INC., WEST COAST NEONATOLOGY, INC., PEDIATRIC PHYSICIAN SERVICES, INC. AND AMBULATORY PEDIATRICS, ÍNC., AS ASSIGNEES OF BENEFITS AND MEDICAL SERVICES PROVIDERS, admit to the truth of the following matters within thirty (30) days after service of this Request:

"The Mason Twins" means the twin children of John Mason, Jr. and Nancy Mason, who allegedly received treatment from the Plaintiffs, for life-threatening health-related conditions.

1. ALL CHILDREN'S HOSPITAL, INC. was required by law to provide the "life-saving medical services" identified in paragraph 16 of the First Amended Complaint.



EXHIBIT B-2

2.    ALL CHILDREN'S HOSPITAL, INC. started providing health-related services to the Mason Twins before it secured from MEDICAL SAVINGS INSURANCE COMPANY any certification of coverage for treatment.

3.    Before each hospitalization that resulted in a bill that is at issue in this case, no person on behalf of the Mason Twins signed any written document that identified the dollar amount that would be charged for any medical services, drugs, equipment, or other goods and services to be provided by any Plaintiff.

4     Before the hospitalization that resulted in a bill that is at issue in this case, neither parent of the Mason Twins signed any written document that identified the dollar amount that would be charged for any medical services, drugs, equipment, or other goods and services to be provided by any Plaintiff.

5.    Neither of the Mason Twins ever agreed to pay unreasonable charges for medical care provided by any Plaintiff.  (For purposes of this Request For Admission, "unreasonable charges" is defined as any charge that is excessive in relationship to the cost of what was provided.)

6.    No person or company, on behalf of the Mason Twins ever agreed to pay unreasonable charges for medical care provided by any Plaintiff.  (For purposes of this Request For Admission, "unreasonable charges" is defined as any charge that is excessive in relationship to the cost of what was provided.)

7.    Prior to the commencement of this action, no Plaintiff ever disclosed to either parent of the Mason Twins the Plaintiff's cost for each item that was a part of the amount billed for healthcare-related goods and services provided to the Mason Twins during each hospitalization.

8.    No Plaintiff has ever disclosed to either parent of the Mason Twins that Plaintiff's cost for each item that was a part of the amount billed for healthcare-related goods and services provided to the Mason Twins.

9.    The cost of all healthcare-related goods and services provided by ALL CHILDREN'S HOSPITAL, INC. was less than one third of the total amount billed for the healthcare-related goods and services provided to the Mason Twins.

10.   The cost of all healthcare-related goods and services provided by ALL CHILDREN'S HOSPITAL, INC. was less than one quarter of the total amount billed for the healthcare-related goods and services provided to the Mason Twins.

11.   Neither of the parents of the Mason Twins secured the consent of MEDICAL SAVINGS INSURANCE COMPANY prior to the assignment of any of their rights under their contract with MEDICAL SAVINGS INSURANCE COMPANY.

2

12.     If the insurance contract referred to and annexed to the Plaintiffs' First Amended Complaint were not properly rescinded, then any obligation on the part of MEDICAL SAVINGS INSURANCE COMPANY to pay charges billed by each Plaintiff would be governed by the terms of that insurance contract.

13.     Neither of the parents of the Mason Twins secured the written consent of MEDICAL SAVINGS INSURANCE COMPANY prior to the assignment of any of the rights of the Mason Twins under the contract with MEDICAL SAVINGS INSURANCE COMPANY.

14.     Neither of the parents of the Mason Twins secured the verbal consent of MEDICAL SAVINGS INSURANCE COMPANY prior to the assignment of any of the rights of the Mason Twins under the contract with MEDICAL SAVINGS INSURANCE COMPANY.

15.     Nobody acting on behalf of the parents of the Mason Twins secured the written consent of MEDICAL SAVINGS INSURANCE COMPANY prior to the assignment of any of the rights under the contract that the Mason Twins had with MEDICAL SAVINGS INSURANCE COMPANY.

16.     Nobody acting on behalf of the parents of the Mason Twins secured the verbal consent of MEDICAL SAVINGS INSURANCE COMPANY prior to the assignment of any of the rights under the contract that the Mason Twins had with MEDICAL SAVINGS INSURANCE COMPANY.

17.     Nobody acting on behalf of the parents of the Mason Twins secured the written consent of MEDICAL SAVINGS INSURANCE COMPANY prior to the assignment of any of the rights under the contract that the parents of the Mason Twins had with MEDICAL SAVINGS INSURANCE COMPANY.

18.     Nobody acting on behalf of the parents of the Mason Twins secured the verbal consent of MEDICAL SAVINGS INSURANCE COMPANY prior to the assignment of any of the rights under the contract that the parents of the Mason Twins had with MEDICAL SAVINGS INSURANCE COMPANY.

19.     Annexed hereto as Tab "A" is a true copy of the application for health insurance coverage completed by John F. Mason and Nancy Mason.

20.     With respect to the original document that Tab "A" is a copy of, the signature on the second page of Tab "A," directly above the line identified as "Signature of Proposed Insured (you) is the signature placed on the document by John Mason;

3

21.   With respect to the original document that Tab "A" is a copy of, the signature on the second page of Tab "A," directly above the line identified as "Signature of Spouse (if to be covered)" is the signature placed on the document by Nancy Mason;

22.   On March 7, 2001, John Mason signed the original document of which Tab "A" is a copy;

23.   On March 7, 2001, Nancy Mason signed the original document of which Tab "A" is a copy;

24.   On March 7, 2001, John F. Mason and Nancy Mason were husband and wife.

25.   Within the five year period prior to March 7, 2001, Nancy Mason had been prescribed the medication known as Synthoid, for treatment of a thyroid condition.

26.   Within one week prior to March 7, 2001, Nancy Mason's prescription for Synthoid was refilled.

27.   On January 13, 1999, Nancy Mason had blood test results showing high cholesterol and triglyceride levels.

28.   On January 13, 1999, Nancy Mason had blood test results showing a cholesterol level of 239, a triglyceride level of 267, and a cholesterol to triglyceride ratio of 5.7.

29.   On June 16, 1999, Nancy Mason had been diagnosed with amenorrhea.

30.   On June 13, 2000, Nancy Mason was examined and diagnosed with "sever hypothalamic oligo amenorrhea."

31.   Prior to June 13, 2000, but within ten years prior to March 7, 2001, Nancy Mason underwent hormone therapy, in an attempt to stimulate ovulation.

32.   On June 13, 2000, Nancy Mason and a physician had a discussion regarding the possible risks and benefits to Nancy Mason associated with taking a higher dose of Clomid

33.   On June 13, 2000, Nancy Mason and a physician had a discussion regarding the possible risks and benefits to Nancy Mason associated with taking a a low dose of gonadotropins.

34.   In July 2000, Nancy Mason took the medication known as Clomid for five days.

35.   At one or more points in time within five years prior to March 7, 2001, Nancy Mason knew that she had a disorder of the female reproductive organs.

36.   At one or more points in time within five years prior to March 7, 2001, Nancy Mason knew that she had irregular menstruation.

37.   At one or more points in time within five years prior to March 7, 2001, John F. Mason knew that Nancy Mason had a disorder of the female reproductive organs.

38.   At one or more points in time within five years prior to March 7, 2001, John F. Mason knew that Nancy Mason had irregular menstruation.

39.   At one or more points in time within five years prior to March 7, 2001, Nancy Mason knew that she had a disorder of the thyroid.

40.   At one or more points in time within five years prior to March 7, 2001, John F. Mason knew that Nancy Mason had a disorder of the thyroid.

41.   Within five years prior to March 7, 2001, Nancy Mason reported to a physician that she had only had six "periods" in her entire life.

42.   Within five years prior to March 7, 2001, Nancy Mason completed more than one study cycle, using gonadotropins.

43.   During the year 2000, Nancy Mason underwent HCG and intrauterine insemination.

44.   During the year 2000, Nancy Mason conferred with at least one physician concerning fertility treatment.

45.   In December 2000, Nancy Mason communicated to a physician that she wished to continue taking additional cycles of gonadotropin therapy with intrauterine insemination.

46.   The insurance application signed by John Mason and Nancy Mason, a copy of which is annexed hereto as Tab A, does not contain responses stating that Nancy Mason ever suffered from irregular menstruation.

47.   The insurance application signed by John Mason and Nancy Mason, a copy of which is annexed hereto as Tab A, does not contain responses stating

5

that Nancy Mason ever suffered from cholesterol or triglyceride abnormalities.

48.   The insurance application signed by John Mason and Nancy Mason, a copy of which is annexed hereto as Tab A, does not contain responses stating that Nancy Mason ever suffered from any disorder of the female reproductive organs.

49.   The insurance application signed by John Mason and Nancy Mason, a copy of which is annexed hereto as Tab A, does not contain responses stating that Nancy Mason had ever discussed or been advised to have testing, consultations or surgery that has not been completed.

50.   The insurance application signed by John Mason and Nancy Mason, a copy of which is annexed hereto as Tab A, does not contain responses stating that Nancy Mason ever suffered from irregular menstruation.

51.   The insurance application signed by John Mason and Nancy Mason, a copy of which is annexed hereto as Tab A, does not contain responses making any reference to any conditions or treatment of Nancy Mason related to the thyroid, cholesterol, menstruation, the reproductive organs, or fertility.

52.   Correspondence from Edgar R. Lantis, dated May 29, 2002 was sent to John F. Mason Jr. and Nancy M. Mason.

53.   The original of the correspondence annexed hereto as Tab "B" was received by John F. Mason Jr.

54.   The original of the correspondence annexed hereto as Tab "B" was received by Nancy M. Mason.

55.   Check number 08426, in the sum of $2,087.00, dated May 28, 2002, was received by John F. Mason Jr.

56.   Check number 08426, in the sum of $2,087.00, dated May 28, 2002, was received by Nancy M. Mason.

57.   Check number 08427, in the sum of $4,094.92, dated May 28, 2002, was received by John F. Mason Jr.

58.   Check number 08427, in the sum of $4,094.92, dated May 28, 2002, was received by Nancy M. Mason.

59.   Nancy Mason cashed and/or deposited check number 08426, in the sum of $2,087.00.

60.    Nancy Mason cashed and/or deposited check number 08427, in the sum of $4,094.92.

61.    John F. Mason, Jr. cashed and/or deposited check number 08426, in the sum of $2,087.00.

62.    John F. Mason, Jr. cashed and/or deposited check number 08427, in the sum of $4,094.92.

63.    In May 2002, John F. Mason, Jr. and Nancy Mason shared a joint checking account.

64.    In May 2002, John F. Mason, Jr. and Nancy Mason shared a joint savings account.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALL CHILDREN'S HOSPITAL, INC.,
WEST COAST NEONATOLOGY, INC.,
PEDIATRIC PHYSICIAN                          CASE NO.: 8:04 CV 186 T26 EAJ
SERVICES, INC. and AMBULATORY
PEDIATRICS, INC.,
as assignees of benefits and
medical services providers,

       Plaintiffs,

v.

MEDICAL SAVINGS INSURANCE
COMPANY,

       Defendant.

_____/

## NOTICE OF SERVING INTERROGATORY

     PLEASE TAKE NOTICE that the Defendant, MEDICAL SAVINGS INSURANCE

COMPANY, by and through its undersigned counsel, and pursuant to the Federal Rules

of Civil Procedure, hereby files its Notice of Serving Interrogatory upon each Plaintiff:

## INTERROGATORY

1.    Set forth separately, as to each denial of knowledge and information
sufficient to fully respond to each Request for Admission, the basis for the
denial, the reasonable inquiry undertaken in an attempt to fully respond to
the Request, and the information known or readily obtainable to each Plaintiff
in connection with the Request.

8

ALL CHILDREN'S HOSPITAL, INC.


By: _____

STATE OF

COUNTY OF

BEFORE ME, the undersigned authority, personally appeared ALL CHILDREN'S

HOSPITAL, INC., by _____, who is personally

known to me or who has produced _____* as identification,

and who, after first being duly sworn, deposes and says that (s)he has read the foregoing

Answer to Interrogatory which was propounded to her/him by the Defendant, MEDICAL

SAVINGS INSURANCE COMPANY, and to the best of her/his knowledge and belief it is

true and correct.

SWORN TO AND SUBSCRIBED before me, this ___ day of _____, 2004.

*List type of identification produced or "N/A," whichever is applicable.


_____
NOTARY PUBLIC

State of

My Commission Expires:

9

WEST COAST NEONATOLOGY, INC.


By: _____

STATE OF FLORIDA

COUNTY OF

BEFORE ME, the undersigned authority, personally appeared WEST COAST

NEONATOLOGY, INC., by _____, who is personally

known to me or who has produced _____* as identification,

and who, after first being duly sworn, deposes and says that (s)he has read the foregoing

Answer to Interrogatory which was propounded to her/him by the Defendant, MEDICAL

SAVINGS INSURANCE COMPANY, and to the best of her/his knowledge and belief it is

true and correct.

SWORN TO AND SUBSCRIBED before me, this ___ day of _____, 2004.

*List type of identification produced or "N/A," whichever is applicable.


_____

NOTARY PUBLIC

State of

My Commission Expires:

10

PEDIATRIC PHYSICIAN SERVICES, INC.


By: _____

STATE OF

COUNTY OF

BEFORE ME, the undersigned authority, personally appeared PEDIATRIC

PHYSICIAN SERVICES, INC., by _____, who is

personally known to me or who has produced _____* as

identification, and who, after first being duly sworn, deposes and says that (s)he has read

the foregoing Answer to Interrogatory which was propounded to her/him by the Defendant,

MEDICAL SAVINGS INSURANCE COMPANY, and to the best of her/his knowledge and

belief it is true and correct.

SWORN TO AND SUBSCRIBED before me, this ___ day of _____, 2004.

*List type of identification produced or "N/A," whichever is applicable.


_____

NOTARY PUBLIC

State of

My Commission Expires:

11

AMBULATORY PEDIATRICS, INC.

By: _____

STATE OF

COUNTY OF

BEFORE ME, the undersigned authority, personally appeared AMBULATORY

PEDIATRICS, INC., by _____, who is personally

known to me or who has produced _____* as identification,

and who, after first being duly sworn, deposes and says that (s)he has read the foregoing

Answer to Interrogatory which was propounded to her/him by the Defendant, MEDICAL

SAVINGS INSURANCE COMPANY, and to the best of her/his knowledge and belief it is

true and correct.

SWORN TO AND SUBSCRIBED before me, this ___ day of _____, 2004.

*List type of identification produced or "N/A," whichever is applicable.

_____

NOTARY PUBLIC

State of

My Commission Expires:

12

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALL CHILDREN'S HOSPITAL, INC.,
WEST COAST NEONATOLOGY, INC.,
PEDIATRIC PHYSICIAN                         CASE NO.: 8:04 CV 186 T26 EAJ
SERVICES, INC. and AMBULATORY
PEDIATRICS, INC.,
as assignees of benefits and
medical services providers,

        Plaintiffs,

v.

MEDICAL SAVINGS INSURANCE
COMPANY,

        Defendant.
_____/

## REQUEST FOR PRODUCTION

      PLEASE TAKE NOTICE that pursuant to the Federal Rules of Civil Procedure,

Defendant requests that each Plaintiff produce, within thirty (30) days of the date of service

thereof, at the offices of BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP, Bayport

Plaza, Suite 1100, 6200 Courtney Campbell Causeway, Tampa, Florida 33607, where said

documents shall be left for a reasonable period of time for copying or reproduction, a copy

of all writings and other material supporting the denial of each and every paragraph set

forth in the above Request For Admissions.

BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP

*Alan D. Stewart*
_____
ALAN D. STEWART, ESQ.
Florida Bar No.:  0108431
Bayport Plaza, Suite 1100
6200 Courtney Campbell Causeway
Tampa, Florida  33607-5946
Telephone:   (813) 281-1900
Facsimile:   (813) 281-0900
Attorneys for MEDICAL SAVINGS INSURANCE
COMPANY

## CERTIFICATE OF SERVICE

I certify that a copy hereof has been furnished to:

Stephanie Alexander, Esq.
Tripp Scott, P.A.
110 Southeast 6th Street, 15th Floor
Fort Lauderdale, FL  33301

by U.S. Mail on May___3___, 2004.

*Alan D. Stewart*
_____
ALAN D. STEWART, ESQ.

14

**MEDICAL SAVINGS HEALTH PLAN**

## APPLICATION FOR INSURANCE
Please print with black ink.
To be personally completed by the proposed insured.

Requested Effective Date 3-15-01

5835 W. 74th Street
Indianapolis, IN 46278-1757
Phone: (317) 329-8222
Fax: (317) 329-3080

| Applicant's first name and initial | Last name | Social Security # | Sex | Birthdate | Height | Weight |
|---|---|---|---|---|---|---|
| John E | Mason | | | | | 85 |

| If a joint application, spouse's first name and initial | Last name | Social Security # | Sex | Birthdate | Height | Weight |
|---|---|---|---|---|---|---|
| Karen M | Mason | | | | | |

| Home address (number and street, or P.O. Box) | Home Phone (with area code) | Work Phone (with area code) |
|---|---|---|
| | (852) 216 0950 | 233 196 50 |

City, State, Zip code

| Dependent Children to be covered (attach separate paper for more space) | First name | | Last name | | Sex | Birthdate | Height | Weight |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**Income**
☐ Under $15,000  ☐ $15,001 - $25,000  ☐ $25,001 - $35,000  ☐ $100,000 or more
☐ $35,001 - $50,000  ☐ $50,001 - $75,000  ☐ $75,001 - $99,999

**Applicant's Beneficiary** (Give full name, relation to you and age)
(Applicant will be the beneficiary for all other persons, if applicable)

**Plan Type**
Select One

☐ $1,550 Deductible Single
☐ $3,100 Deductible Husband & Wife
☐ $3,100 Deductible Parent & Child(ren)
☐ $3,100 Deductible Family
☐ $2,350 Deductible Single
☐ $4,650 Deductible Husband & Wife
☐ $4,650 Deductible Parent & Child(ren)
☐ $4,650 Deductible Family

**Premium Computation** (see rate guide for area and rate)

| County of Residence | | Rate Area | |
|---|---|---|---|
| Health Premium | A | Optional Life Premium B | Admin. Fee C |
| | | Monthly Insurance Cost ( A+B+C) | M1 |
| | | Quarterly Insurance Cost (M1 x 3) | Q1 |

50 Indemnity Rider Requested

**Medical Savings Deposit** - if applicable
Specify amount and frequency (months, quarterly)

Mode (frequency) (monthly, quarterly)        Amount

**Prior Coverage Questions**
Are applicants covered by, or have they been covered by health insurance in the last 6 months?  ☒ YES  ☐ NO
(If Medical Savings Insurance Company issues coverage, it will not take effect until any previous health insurance is no longer in force.)
Has any applicant ever applied for, or been covered by Medical Savings Insurance Company?  ☐ YES  ☒ NO

**Health Questions**

|  | YES | NO |
|---|---|---|
| 1. Has any applicant smoked cigarettes ☐  or used: chewing tobacco ☐  snuff ☐  pipe ☐  or cigar ☐  within the last 12 months? If so, indicate who: | ☐ | ☒ |
| 2. In the past 5 years, has any applicant taken part in flying as a pilot, parachuting, hang gliding, underwater diving, auto racing, or driving or riding as a passenger any type of motorcycle; or does any applicant expect to take part in any of these activities in the next 2 years? If YES, specify who and which activities here: | ☐ | ☒ |
| 3. Is any applicant currently | | |
| a. a user of alcoholic beverages in excess of 14 drinks per week? : (one drink equals: 12 oz. beer, 5 oz of wine, 1 oz of hard liquor) If yes, show who and how many drinks per week. | ☐ | ☒ |
| b. taken medication or receiving medical treatment of any kind? (Answer under Health Details, page 2) | ☐ | ☒ |
| 4. Is any applicant or family member (whether or not listed on the application) an expectant parent or currently pregnant? If yes, give expectant parent's name (mother/father) | ☐ | ☒ |
| 5. Does any applicant or family member have a history of pregnancy complications, or Cesarean Section delivery? | ☐ | ☒ |
| **If answer to questions 6-12 is YES, provide all details in the area that follows.** | | |
| 6. Has any applicant gained or lost 15 pounds or more within the last 12 months? | ☐ | ☒ |
| 7. Has any life or health insurance application or policy on any applicant ever been voided, declined, canceled, postponed, or modified as to plan, amount or rate? | ☐ | ☒ |
| 8. Has any applicant within the last 10 years, had any indication, diagnosis, or treatment of any disease or disorder of the: | | |
| a. heart or circulatory system such as high blood pressure, anemia, heart attack, heart murmur, chest pain, irregular heart beat, varicose veins, phlebitis, or stroke? | ☐ | ☒ |
| b. nervous system, such as epilepsy, seizures, convulsions, headaches, or paralysis? | ☐ | ☒ |

No application will be accepted if received by Medical Savings Insurance Company more than 15 days after the date signed.
**ALTERED APPLICATIONS WILL NOT BE ACCEPTED**
California law prohibits

**Health Questions Continued**

c. digestive system, such as ulcer, gastritis, intestinal disorders, colitis, hemorrhoids, bloody stools, or hernia, or of the esophagus, liver, pancreas, spleen or gallbladder?

d. muscular or skeletal systems, such as arthritis, gout, or any jaw, knee, back, joint or spine disorder or deformity?

e. lungs or respiratory system, such as allergies, asthma, bronchitis, tuberculosis, pneumonia or emphysema?

f. bladder, kidney, or genito-urinary system, such as urinary tract infections or blood in the urine?

g. male or female reproductive organs, prostate problems, irregular menstruation, abnormal pap test?

h. eyes, ears, nose, mouth or throat, such as double vision, ear infection, deviated nasal septum, thrush, or tonsillitis?

9. Has any applicant within the past 10 years had any indication, diagnosis or treatment of:

a. tumor, cyst, polyp, or growth of any kind?

b. skin disorder or disease?

c. any blood abnormalities, including cholesterol or triglyceride abnormalities?

d. immune system deficiencies or sexually transmitted diseases (excluding a positive test for HIV)?

e. emotional or behavioral problems; anxiety, depression, nervousness or other psychiatric illnesses, suicide attempts or gestures, or consulted with a mental health professional?

f. diabetes, sugar in the urine, blood, thyroid, breast (such as fibrocystic breast disease), or other gland disorders?

g. cancer, leukemia or any type of malignancy, other disease, disorder, or injury?

10. Has any applicant within the past 10 years been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Complex or Condition (ARC)?

11. Within the last 5 years, has any applicant:

a. had any indication, diagnosis, or treatment of alcohol or drug dependency, abuse, or problem?

b. used any drug not prescribed, such as opiates, and/or hallucinogens?

c. discussed or been advised to have testing, consultations or surgery that have not been completed?

12. Has any applicant had any indication, diagnosis, or treatment of any disease, disorder, or injury not previously referenced? If yes, give name and cause:

**Health Details**  This space must be used to provide details for any health questions answered "Yes" on the previous questions..
If you need more space, attach a separate sheet of paper and check this box. ☒

| Question Number | Person's First Name | Symptom or Condition | Dates | Treatment, Advice Given, Results, and Other Details | Names and Address of Doctors |
|---|---|---|---|---|---|
| | | | | | |

...y that I have personally completed this application and I represent that the answers and statements on this application are true, complete and ...ly recorded to the best of my knowledge. I UNDERSTAND AND AGREE THAT: (1) the statements and answers given in this application, and in ...pplements or amendments to it, will form the basis of, and be made a part of, any policy or certificate which may be issued; (2) I have inquired about, ...re personal knowledge of, the medical history for each person on this application; (3) any incorrect or incomplete information on this application may ...i loss of coverage or claim denial; (4) in accordance with the conditional receipt given to me, this application and the payment of the initial premium ...ot give me immediate coverage; (5) the agent or broker is only authorized to submit the application and initial premium; may not change any ...ion, policy, or receipt and cannot waive any right or requirement; (6) with respect to health, the effective date for coverage of illness is the 15th day after ...ctive date of coverage for injuries; and (7) under the terms of the policy/certificate, you and Medical Savings Insurance Company are giving up the right ...any dispute decided in a court of law before a jury. FRAUD NOTICE: Any person who knowingly and with intent to injure, defraud, or deceive any ...iles a statement of claim or an application containing false, incomplete, or misleading information is guilty of a felony of the the third degree.

...gned on **03·07·01** at **Brooksville** **Florida**   X _____
Date        City       State           Signature of Proposed Insured (you)

X _____              X _____
Signature of Parent/Guardian (if you are a minor)      Signature of Spouse (if to be covered)

---

**Producer, Complete This Section**

...cer of record on this case, I personally witnessed the applicant(s) complete and sign this application.

X _____     **Martha V Holck**     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
...nature              Printed Name

# ABEL & LANTIS

### A PROFESSIONAL CORPORATION
### ATTORNEYS AT LAW
———

DAVID R. ABEL
EDGAR R. LANTIS*

*ALSO ADMITTED IN MI

301 EAST CARMEL DRIVE
BLDG. F, STE. 100
CARMEL, INDIANA 46032
(317) 571-0151
FAX (317) 571-0160

MAILING ADDRESS:
P.O. BOX 306
CARMEL, INDIANA 46082-0306

**Via Certified Mail - - Return Receipt Requested**

May 29, 2002

John F. Mason, Jr. and Nancy M. Mason
18276 Mason Smith Road
Brooksville, FL 34604

Re:     Medical Savings Insurance Company
        I.D. No. : 8584
        Rescission of Contract of Insurance

Dear Mr. and Mrs. Mason:

I am contacting you on behalf of Medical Savings Insurance Company, to inform you that the health insurance coverage, originally effective March 15, 2001, has been rescinded by the company due to material misrepresentations in your March 7, 2001, signed application for insurance (copy enclosed).

Question No. 3.b. of the application reads:

"3. Is any applicant currently

...

b. taken (sic) medication or receiving medical treatment of any kind? (Answer under Health Details, page 2)"

Your answer to this question was "NO."

Question No. 8.g. of your application reads:

"8. Has any applicant within the last 10 years had any indication, diagnosis, or treatment of any disease or disorder of the:

...

g. male or female reproductive organs, prostate problems, irregular menstruation, abnormal pap test?" (Emphasis added.)

Your answer to this question was "NO."

John F. & Nancy M. Mason
May 29, 2002
Page 3.

- On January 13, 1999, less than three (3) years before the date of your application, blood test results showed that Mrs. Mason suffered from high cholesterol and triglycerides. The testing revealed cholesterol of 239, triglycerides of 267, and a cholesterol/HDL ratio of 5.7.

- On the date of your application Mrs. Mason had a long history of infertility and had been specifically diagnosed with hypothalamic amenorrhea (absence of or abnormal cessation of the menses). Medical records indicate that Mrs. Mason was diagnosed with amenorrhea on June 16, 1999, less than two (2) years before the date of your application. She was examined on June 13, 2000, less than a year before your insurance application, and again diagnosed with "severe hypothalamic oligo amenorrhea" after hormone therapy (Clomid) had failed to stimulate ovulation. Records from the June 13, 2000, consultation indicate that Mrs. Mason and her doctor had a discussion, in excess of 20 minutes, regarding the pros, cons, risks, and benefits of higher dose Clomid or moving to low dose gonadotropins. The doctor's chart, related to a follow up examination on July 18, 2000, indicate that Mrs. Mason had recently completed five days on Clomid.

- On January 29, 2001, less than six (6) <u>weeks</u> before your application, Mrs. Mason received additional infertility planning. Medical records indicate that her underlying diagnosis was hypothalamic amenorrhea. She had recently completed four study cycles, two using gonadotropins, two which were canceled, one from hyper-stimulation and one due to poor response, and two culminated with HCG and intrauterine insemination in November and December, 2000, without conception. Mrs. Mason reported to the doctor that she had only six periods in her entire life. The doctor spent nearly thirty minutes discussing options for future fertility treatment. According to the records, Mrs. Mason indicated a desire to continue with three to four more cycles of gonadotropin therapy with intrauterine inseminations. The doctor's recommendation was for treatment to move forward with Repronex at 1.5 ampules per day with HCG timed inseminations for three to four cycles.

Based on this information, it appears that your responses to the above-quoted questions were false. These misrepresentations were material to the risk or hazard assumed by Medical Savings Insurance, since the company would not have issued you health insurance coverage if the true facts had been known and disclosed in your application for insurance. Specifically, Medical Savings would not have issued coverage if it had known that on the date of your application Mrs. Mason was taking prescription medication to control a

John F. & Nancy M. Mason
May 29, 2002
Page 4.

long-term thyroid disorder; that in the 10 years immediately preceding the date of your application, in fact as recently as six weeks before your application, Mrs. Mason had indications, diagnosis and treatment of a disease or disorder of her female reproductive organs and for irregular menstruation; that in the 10 years preceding the date of your application, Mrs. Mason had indications and diagnosis of cholesterol and triglyceride abnormalities; and that in the five years preceding the date of your application, Mrs. Mason had been advised to have additional testing and consultations related to her fertility disorder and hypothalmic amenorrhea.

Your coverage has been rescinded effective March 15, 2001, as though it had never been issued. Enclosed is a check, in the sum of $2,087.00, which represents a full and complete refund of all insurance premiums and administrative fees paid to Medical Savings. Also enclosed is a check in the sum of $4,094.92, which represents the remaining balance of your medical savings account, plus interest.

Sincerely,

Edgar R. Lantis

ERL/bmh
Enclosures

cc:     Medical Savings Insurance Company w/encl

**MEDICAL SAVINGS**
**HEALTH PLAN**

# APPLICATION FOR INSURANCE
Please print with black ink.
To be personally completed by the proposed insured.

Requested Effective Date **3-15-01**

5835 W. 74th St
Indianapolis, IN 46278-17
Phone: (317) 329-82
Fax: (317) 329-30

| Applicant's first name and initial | Last name | Social Security # | Sex | Birthdate | Height | Weigh |
|---|---|---|---|---|---|---|
| John F Jr | Mason | 262 84 238 | M | 2-24-63 | 6'2" | 185 |

| If a joint application, spouse's first name and initial | Last name | Social Security # | Sex | Birthdate | Height | Weigh |
|---|---|---|---|---|---|---|
| Nancy M | Mason | 593 42 4557 | F | 03/30/70 | 5'7" | 17c |

| Home address (number and street, or P.O. Box) | Home Phone (with area code) | Work Phone (with area code) |
|---|---|---|
| 18270 Mason Smith Rd. | (352) 544-0920 | (352) 796-517 |

City, State, Zip code
**Brooksville FL 34604**

| Dependent Children to be covered (attach separate paper for more space) | First name | Last name | Sex | Birthdate | Height | Weight |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

**Income**
- [ ] Under $15,000
- [ ] $15,001 - $25,000
- [ ] $25,001 - $35,000
- [ ] $100,000 or more
- [ ] $35,001 - $50,000
- [x] $50,001 - $75,000
- [ ] $75,000 - $99,999

**Applicant's Beneficiary** (Give full name, relation to you and age)
(Applicant will be the beneficiary for all other persons, if applicable)  **Nancy Mason - wife   30**

**Plan Type**
**Select One**
- [x] $1,550 Deductible Single
- [x] $3,100 Deductible Husband & Wife
- [x] $3,100 Deductible Parent & Child(ren)
- [x] $3,100 Deductible Family
- [ ] $2,350 Deductible Single
- [ ] $4,650 Deductible Husband & Wife
- [x] $4,650 Deductible Parent & Child(ren)
- [ ] $4,650 Deductible Family

**Premium Calculation**
(see rate guide for area and rate)

| County of Residence | | Rate Area | |
|---|---|---|---|
| Hernando | | | |

| Health Premium | A | 109 | Optional Life Premium | B | | Admin. Fee | C | 375% |
|---|---|---|---|---|---|---|---|---|
| | | | Monthly Insurance Cost ( A+B+C) | | | | M1 | 113.75 |
| | | | Quarterly Insurance Cost (M1 x 3) | | | | Q1 | |

50 Indemnity Rider
Requested

**Medical Savings Deposit** - if applicable
Specify amount and frequency (months, quarterly)

| Mode (frequency), (monthly, quarterly) | MO | Amount | $ 190.00 |
|---|---|---|---|

| Prior Coverage Questions | Are applicants covered by, or have they been covered by health insurance in the last 6 months? (If Medical Savings Insurance Company issues coverage, it will not take effect until any previous health insurance is no longer in force.) | [x] YES | [ ] NC |
|---|---|---|---|
| | Has any applicant ever applied for, or been covered by Medical Savings Insurance Company? | [ ] YES | [x] NC |

**Health Questions**

| | | YES | NO |
|---|---|---|---|
| 1. | Has any applicant smoked cigarettes [ ]   or used: chewing tobacco [ ]   snuff [ ]   pipe [ ]   or cigar [ ] within the last 12 months? If so, indicate who: _____ | [ ] | [x] |
| 2. | In the past 5 years, has any applicant taken part in flying as a pilot, parachuting, hang gliding, underwater diving, auto racing, or driving or riding as a passenger any type of motorcycle; or does any applicant expect to take part in any of these activities in the next 2 years? If YES, specify who and which activities here: _____ | [ ] | [x] |
| 3. | Is any applicant currently | | |
| | a. a user of alcoholic beverages in excess of 14 drinks per week? : (one drink equals: 12 oz. beer, 5 oz of wine, 1 oz of hard liquor) If yes, show who and how many drinks per week. _____ | [ ] | [x] |
| | b. taken medication or receiving medical treatment of any kind? (Answer under Health Details, page 2) | [ ] | [x] |
| 4. | Is any applicant or family member (whether or not listed on the application) an expectant parent or currently pregnant? If yes, give expectant parent's name (mother/father) _____ | [ ] | [x] |
| 5. | Does any applicant or family member have a history of pregnancy complications, or Cesarean Section delivery? | [ ] | [x] |
| | If answer to questions 6-12 is YES, provide all details in the area that follows. | | |
| 6. | Has any applicant gained or lost 15 pounds or more within the last 12 months? | [ ] | [x] |
| 7. | Has any life or health insurance application or policy on any applicant ever been voided, declined, canceled, postponed, or modified as to plan, amount or rate? | [ ] | [x] |
| 8. | Has any applicant within the last 10 years, had any indication, diagnosis, or treatment of any disease or disorder of the: | | |
| | a. heart or circulatory system such as high blood pressure, anemia, heart attack, heart murmur, chest pain, irregular heart beat, varicose veins, phlebitis, or stroke? | [ ] | [x] |
| | b. nervous system, such as epilepsy, seizures, convulsions, headaches, or paralysis? | [ ] | [x] |

No application will be accepted if received by Medical Savings Insurance Company more than 15 days after the date signed.
**ALTERED APPLICATIONS WILL NOT BE ACCEPTED.**
California law prohibits ... HIV ...

**Health Questions Continued**

c. digestive system, such as ulcer, gastritis, intestinal disorders, colitis, hemorrhoids, bloody stools, or hernia, or of the esophagus, liver, pancreas, spleen or gallbladder?

d. muscular or skeletal systems, such as arthritis, gout, or any jaw, knee, back, joint or spine disorder or deformity?

e. lungs or respiratory system, such as allergies, asthma, bronchitis, tuberculosis, pneumonia or emphysema?

f. bladder, kidney, or genito-urinary system, such as urinary tract infections or blood in the urine?

g. male or female reproductive organs, prostate problems, irregular menstruation, abnormal pap test?

h. eyes, ears, nose, mouth or throat, such as double vision, ear infection, deviated nasal septum, thrush, or tonsillitis?

9. Has any applicant within the past 10 years had any indication, diagnosis or treatment of:

a. tumor, cyst, polyp, or growth of any kind?

b. skin disorder or disease?

c. any blood abnormalities, including cholesterol or triglyceride abnormalities?

d. immune system deficiencies or sexually transmitted diseases (excluding a positive test for HIV)?

e. emotional or behavioral problems; anxiety, depression, nervousness or other psychiatric illnesses, suicide attempts or gestures, or consulted with a mental health professional?

f. diabetes, sugar in the urine, blood, thyroid, breast (such as fibrocystic breast disease), or other gland disorders?

g. cancer, leukemia or any type of malignancy, other disease, disorder, or injury?

10. Has any applicant within the past 10 years been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Complex or Condition (ARC)?

11. Within the last 5 years, has any applicant:

a. had any indication, diagnosis, or treatment of alcohol or drug dependency, abuse, or problem?

b. used any drug not prescribed, such as opiates, and/or hallucinogens?

c. discussed or been advised to have testing, consultations or surgery that have not been completed?

12. Has any applicant had any indication, diagnosis, or treatment of any disease, disorder, or injury not previously referenced? If yes, give name and cause.

**Health Details**   This space must be used to provide details for any health questions answered "Yes" on the previous questions. If you need more space, attach a separate sheet of paper and check this box. ☐

| Question Number | Person's First Name | Symptom or Condition | Dates | Treatment, Advice Given, Results, and Other Details | Names and Address of Doctors |
|---|---|---|---|---|---|
| | | | | | |

I certify that I have personally completed this application and I represent that the answers and statements on this application are true, complete and correctly recorded to the best of my knowledge. I UNDERSTAND AND AGREE THAT: (1) the statements and answers given in this application, and in any supplements or amendments to it, will form the basis of, and be made a part of, any policy or certificate which may be issued; (2) I have inquired about, and have personal knowledge of, the medical history for each person on this application; (3) any incorrect or incomplete information on this application may result in loss of coverage or claim denial; (4) in accordance with the conditional receipt given to me, this application and the payment of the initial premium does not give me immediate coverage; (5) the agent or broker is only authorized to submit the application and initial premium; may not change any application, policy, or receipt and cannot waive any right or requirement; (6) with respect to health, the effective date for coverage of illness is the 15th day after the effective date of coverage for injuries; and (7) under the terms of the policy/certificate, you and Medical Savings Insurance Company are giving up the right to have any dispute decided in a court of law before a jury. FRAUD NOTICE: Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing false, incomplete, or misleading information is guilty of a felony of the the third degree.

Signed on **03/07/01** at **Brooksville**, **Florida**

Date          City          State

X _____
Signature of Proposed Insured (you)

X _____
Signature of Parent/Guardian (if you are a minor)

X _____
Signature of Spouse (if to be covered)

**Producer, Complete This Section**

he Producer of record on this case, I personally witnessed the applicant(s) complete and sign this application.

_____          Martha V Patrick          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

Signature          Printed Name

## REQUEST FOR PREAUTHORIZED CHARGE PLAN

Medical Savings Insurance Company (M.S.I.C.) is hereby requested and authorized to present charges drawn on my checking account number 063101344 beginning on or about the 15 day of each month thereafter until this authorization is revoked.

I understand that all advance premiums will be refunded to me if coverage is not issued and that the effective date of my insurance will be the date stated in my plan of coverage.
(Note: Your signature below the bank authorization portion will also apply to the above authorization.)
(IMPORTANT: BE SURE TO INCLUDE A VOIDED BLANK CHECK OR A BLANK DEPOSIT SLIP FOR YOUR BANK CHECKING ACCOUNT WITH THIS AUTHORIZATION.

Print the name and address of your bank.

Bank SunTrust NatureCoast

Address South Broad St.

City Brooksville State FL Zip 34601

Authorization to Honor Charges Drawn in the Name of M.S.I.C. As a convenience to me, the undersigned, I authorize you to pay and charge to my account association dues, premium drawn on my account in the name of M.S.I.C. by check, electronic debit, or otherwise. This authorization will remain in effect until revoked by me in writing, and until you actually receive such notice, I agree that you shall be fully protected in honoring such charge. I agree that your treatment of each such charge and your rights with respect to it shall be the same as if a check were signed personally by me. I further agree that if any such charge is dishonored, whether with or without cause, you shall be under no liability whatsoever even though such dishonor results in the forfeiture of insurance.

Medical Savings Insurance Company is instructed to forward authorization to you.

X 3-7-01
Date

X _____
SIGNATURE OF BANK DEPOSITOR - AS SHOWN ON BANK RECORDS FOR THE ACCOUNT TO WHICH THIS AUTHORIZATION IS APPLICABLE

063101344
Checking Account Number

John Mason Tractor Parts & Equipment
Printed Name of Bank Depositor

SunTrust      Southside Office
Name of Bank and Branch Name (if any)

Transit No. _____

---

## AUTHORIZATION TO OBTAIN AND DISCLOSE INFORMATION

I (we) authorize Medical Savings Insurance Company (M.S.I.C.), its reinsurers, and their authorized representatives to obtain information they need to underwrite or verify my application or claim for life or health insurance. Any person having any information as to a diagnosis, the treatment or prognosis of any physical or mental conditions of me or my family and any nonmedical information about me or my family is authorized to give it to the above parties. This includes information related to substance use or abuse. Any doctor or other medical practitioner, hospital, clinic, medical facility, pharmacy, the Veterans Administration, the Medical Information Bureau (MIB), employer, or insurance company that may have such information is authorized to give this information to M.S.I.C.

M.S.I.C. may also release this information about me or my family to its reinsurer, to the MIB, or to another insurance company to whom (we) apply for insurance or request benefits.

This authorization shall remain valid for 30 months from the date shown below. A photocopy of this authorization is as valid as the original. I (we) may obtain a copy by writing to M.S.I.C.

X 3-7-01                    (X) _____        (X) _____
Date                       Signature of Proposed Insured (You)     Signature of Spouse if to be insured

I (we) authorize Medical Savings Insurance Company (M.S.I.C.), its reinsurers, and their authorized representatives to obtain information they need to underwrite or verify my application or claim for life or health insurance. Any person having any information as to a diagnosis, the treatment or prognosis of any physical or mental conditions of me or my family and any nonmedical information about me or my family is authorized to give it to the above parties. This includes information related to substance use or abuse. Any doctor or other medical practitioner, hospital, clinic, medical facility, pharmacy, the Veterans Administration, the Medical Information Bureau (MIB), employer, or insurance company that may have such information is authorized to give this information to M.S.I.C.

M.S.I.C. may also release this information about me or my family to its reinsurer, to the MIB, or to another insurance company to whom (we) apply for insurance or request benefits.

This authorization shall remain valid for 30 months from the date shown below. A photocopy of this authorization is as valid as the original. I (we) may obtain a copy by writing to M.S.I.C.

X  3-7-01          (X) _____          (X) _____
      Date                 Signature of Proposed Insured (You)          Signature of Spouse if to be insured

**MEDICAL SAVINGS**
**INSURANCE COMPANY**

JAN 14 2002

**Claimant's Statement and Authorizati**
Include your identification number on all claims.  Incompl
or incorrect answers may delay processing your clai

5835 West 74th Street, Indianapolis, IN 46278-1757     Phone: (317) 329-8222 FAX: (317) 329-3080

Identification Number: 1214 8584  Patient:: Nancy Mason     Birthdate: 3-26-70
Primary Insured: John F. Mason, Jr  Home Phone: (352) 544-0920   Office Phone: (352) 796-5171
Address: 18276 MasonSmith Rd           City: Brooksville   State: FL   Zip: 34604
Is the above address a new address? ☐ Yes  ☒No
Is the patient: In school full-time? ☐ Yes  ☒No        Employed? ☒Yes  ☐ No
Do you or any family members have other coverage (medical, indemnity, or liability) which might help cover hospital and medica
expenses? ☐ Yes  ☒No If yes, give details below.

| Name of Company | Phone Number | Address | Policyholder | Policy/<br>Certificate No | Is this group<br>insurance? |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

NOTE: If you are on Medicare, or have other health insurance coverage, please include your Medicare or other carrier's
      Explanation of Benefits.

**PART B Complete in Ink Please**

1) How did this condition begin? Please describe in detail from onset all symptoms of the condition. Premature
   delivery of twin boys, 27-28 gestation
2) When did the first symptom of this condition begin? State the exact date if possible. 12-11-01
3) Have you ever had or been treated for the same kind of illness or injury? ☐ Yes    ☒No
   If yes, when? _____ Name and address of attending physician _____

5) Name and address of family physician (even if not consulted for this claim). On back of this page.
6) What ailments, diseases, illnesses, or injuries has the covered person had in the past 5 years?  Please provide name and/o
   description of each condition, dates involved and the name and address of physicians consulted. _____

7) Is the condition the result of an accident or illness? NO
   a)  Related to employment? _____ If yes, are you applying for Worker's Compensation benefits? _____
   b)  Involving a motor vehicle? _____ If yes, please list the names of involved parties, insurance carriers, & policy numbers
   c)  Was a police report filed? _____ With what agency? _____
   d)  If an injury occurred, when and how did it occur? _____

verify that all information contained in this form is true, correct, and complete to the best of my knowledge.

order to process a claim for benefits, I authorize any licensed doctor, practitioner of the healing arts, hospital, clinic, health
lated facility, pharmacy, government agency, insurance company, group policyholder, employee or benefit plan administrator
ving information as to the care, advice, treatment, diagnosis, or prognosis of any physical or mental condition, including
bstance abuse, HIV, or AIDS, or the financial and employment status of the patient, employee, or deceased named below, to
vide this information to Medical Savings Insurance Company or any agent or independent administrator acting on its behalf.

nderstand that I have the right to receive a copy of this authorization upon request.

copy of this shall be as valid as the original. This authorization is valid for twelve months from the date signed.

John F. Mason, Jr.  x _____     1-8-02

| Please Print Name of<br>Patient or Deceased | Signature of Patient, Authorized<br>Representative, or Next of Kin | Date |

08426

John F. Mason Jr.

| | Check Number: | 8426 |
| --- | --- | --- |
| | Check Date: | May 28, 2002 |

| | | Check Amount: | $2,087.00 |
| --- | --- | --- | --- |

Item to be Paid - Description

| | Discount Taken | Amount Paid |
| --- | --- | --- |
| Rescission | | |
| | | 2,087.00 |

---

## MEDICAL SAVINGS
### INSURANCE COMPANY

08426

5835 WEST 74TH STREET
INDIANAPOLIS, IN 46278-1757

NATIONAL CITY BANC ASHLAND
ASHLAND, OHIO
AN AFFILIATE OF
NATIONAL CITY BANC, INDIANA
INDIANAPOLIS, IN
56-389/412

VOID AFTER 120 DAYS

DATE                    AMOUNT

May 28, 2002        *********$2,087.00

PAY   Two Thousand Eighty-Seven and 00/100 Dollars

TO THE
ORDER
OF        John F. Mason Jr.
          18276 Mason Smith Road
          Brooksville, FL 34604

Randll E Suttles
F Patrick Rooney
AUTHORIZED SIGNATURE

SECURITY FEATURES INCLUDED. DETAILS ON BACK.

⑈0⑉00008426⑈ ⑉041203895⑉ 0104950⑈

---

EDICAL SAVINGS INSURANCE COMPANY

John F. Mason Jr.

08426

| | Check Number: | 8426 |
| --- | --- | --- |
| | Check Date: | May 28, 2002 |

| | | Check Amount: | $2,087.00 |
| --- | --- | --- | --- |

Item to be Paid - Description

| | Discount Taken | Amount Paid |
| --- | --- | --- |
| Rescission | | |
| | | 2,087.00 |

-C-1

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY,
FLORIDA

GENERAL JURISDICTION DIVISION
CASE NO. 02-05475 (CA-11)



**RECORDED**

NOV 2 6 2003

Clerk of Circuit
& County Courts

SHERIDAN HEALTHCORP., INC.

    Plaintiff,

v.

BLUE CROSS AND BLUE SHIELD OF
FLORIDA, INC. and HEALTH OPTIONS, INC.,

    Defendants.

_____/

## ORDER GRANTING IN PART PLAINTIFF'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

**THIS CAUSE** came before the Court on Plaintiff, Sheridan Healthcorp,

Inc.'s [Sheridan] Motion for Partial Summary Judgment. Having heard argument

of counsel at the September 9, 2003 hearing, and in substantial conformance with

the oral ruling in a summary manner on that date, **I grant in part**, Sheridan's

motion as follows:

    1.    Sheridan employs physicians who provide hospital-based medical

services such as anesthesiology and neonatology. Defendant, Blue Cross and Blue

Shield of Florida, Inc. [BCBS] is a health insurer offering PPO and related

**EXHIBIT C**



21810 PG 1721

insurance products, and is obligated to pay a portion of medical providers' claims when its subscribers receive their services. Defendant, Health Options, Inc. is a health maintenance organization [HMO] and is obligated to arrange, and pay for these services for its members.

2. Whenever Sheridan's physicians provide hospital-based services, Sheridan sends a claim for its services on an HCFA-1500 claim data set, which sets out its billed charges, or full non-discounted rates.

3. Up until December 31, 2001, the Defendants had a contract with Sheridan allowing them to pay discounted rates, or less than Sheridan's billed charges for services provided by Sheridan members and subscribers. (Sheridan's claim for reimbursement during the contract period before 12/31/01 is not encompassed by this motion.)

4. As of January 1, 2002, the contract between Sheridan and the Defendants terminated. Sheridan seeks to recover the reasonable value of its services for claims arising on and after January 1, 2002.

2

5.     As stipulated at the hearing, contested and/or denied claims, emergency services claims[1], and claims arising prior to January 1, 2002, are "carved out" and not implicated in this summary judgment ruling.

6.     I find that the reasonable value of Sheridan's services rendered after January 1, 2002 are its billed rates.  It is undisputed that Sheridan submits claims to all insurers, including Defendants, which uniformly contain its billed charges.  It is also undisputed that Defendants knew Sheridan would charge Defendants its full, non-discounted billed charges upon the 12/31/01 termination of the contract.  It was the Defendants' intention -- which became apparent from their actions -- to continue receiving the benefit of discounted rates under the original agreement even after being put on notice that the contract term was ending and that the Plaintiff desired to negotiate a new contract.  It would be plainly inappropriate to hold Sheridan to the terms of the contract which, both parties agree, was no longer in effect.  For all purposes, the "bulk rate" supplied by Sheridan in the original contract ceased to exist on December 31, 2001.  Accordingly, when Defendants chose to continue to send their members and subscribers to obtain hospital-based

---

[1] The reasonable value of such services to be determined at the appropriate time, in accordance with §641.513, Fla. Stat.

3

medical services from Sheridan providers after the contract terminated, an implied agreement arose without contract discount rates in effect.[2]

7.     Florida Statute Section 641.3155 provides the criteria for determining the reasonable value of services provided by Sheridan's hospital-based providers to members and subscribers of Defendant, Health Options, Inc., for the period January 1, 2002 to the present. Florida Statute Section 627.6131 provides the criteria for determining the reasonable value of services provided by Sheridan's hospital-based providers to subscribers of Defendant, Blue Cross and Blue Shield of Florida, Inc. for the period October 1, 2002 to the present. These statutes define the claims to be paid by the Defendants, *absent an agreement with a provider for specific rates*, as consisting of the charges submitted by the provider in an HCFA 1500 claim form.

8.     I conclude that, as a matter of law, the reasonable value of Sheridan's services is to be determined by reference to these statutes, and that the statutes indicate the reasonable value of the services is equivalent to the charges as set forth in the HCFA 1500 claims forms submitted by Sheridan to the Defendants.[3]

---

[2] Defendants had numerous opportunities to negotiate with Sheridan concerning the terms of the original contract prior to its termination. Also, Defendants had the obvious option of terminating their business relationship with Sheridan after the contract expired; they chose not to do so.

[3] Nowhere in the pleadings or at hearing have the Defendants claimed that Sheridan provided inadequate medical services, committed any type of fraud, or provided anything but Sheridan's reasonable, standard rates.

4

9.     I further find that, as a matter of law, the contracts between Sheridan and the Defendants dated July 29, 1999 and June 27, 2001 supercede any prior contracts between the Defendants and Sheridan's employed physicians, as to reimbursement rates.  As a result, the prior contracts are of no consequence as to reimbursement rates related to services provided by Sheridan's hospital-based physicians after January 1, 2002.

10.     Defendants' affirmative defenses, to the extent they are not encompassed by this order, are preserved for trial of the remaining issues.

ORDERED in Chambers at Miami, Miami-Dade County, Florida this 31st day of _____, 2003.

Henry H. Harnage
Circuit Court Judge

5

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing order was mailed this 3ST day of _OCTOBER_____, 2003 to:

Kenneth Hartmann, Esq.
2800 First Union Financial Center
200 South Biscayne Boulevard
Miami, FL  33131-2335

Steven Siff, Esq.
201 South Biscayne Boulevard
22nd Floor
Miami, FL  33131-4336

_____
Judicial Assistant to
Judge Henry H. Harnage

6

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

CASE NO. 02-05475 CA-11

SHERIDAN HEALTHCORP, INC.

     Plaintiff,

v.

BLUE CROSS AND BLUE SHIELD OF
FLORIDA, INC. and HEALTH OPTIONS, INC.,

     Defendants.

_____/

**RECORDED**

DEC 1 6 2003

Clerk of Circuit
& County Courts

## ORDER GRANTING STIPULATION VACATING PARTIAL SUMMARY JUDGMENT DATED OCTOBER 31, 2003 AND DISMISSING ACTION WITH PREJUDICE

     **THIS CAUSE** having come before this Court upon the parties Stipulation to

Vacate Partial Summary Judgment Dated October 31, 2003, and to Dismiss with Prejudice, and

the Court having reviewed the file, and being otherwise fully apprised in the premises, it is

     **ORDERED AND ADJUDGED:**

     1.    This Court's Order Granting Partial Summary Judgment Dated October

31, 2003 is hereby vacated; and

     2.    This action is dismissed with prejudice, including all complaints and

counterclaims, each party to bear its own costs and attorneys' fees.

December 12, 2003

Henry H. Harnage
Circuit Court Judge

Copies Furnished to:
Harley S. Tropin, Esq.
Steven E. Siff, Esq.

1

MIA 278081-1.022370.0014

21839 PG 1615