## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

ALL CHILDREN'S HOSPITAL, INC.,
WEST COAST NEONATOLOGY, INC.,
PEDIATRIC PHYSICIAN SERVICES, INC.,
and AMBULATORY PEDIATRICS, INC.

        Plaintiffs,

v.

                                        CASE NO: 8:04-cv-186-T-26EAJ

MEDICAL SAVINGS INSURANCE
COMPANY,

        Defendant.

_____/

### O R D E R

This cause comes before the Court on Defendant's Motion for Summary Judgment with

Incorporated Memorandum of Law (Dkt. 129), Statement of Undisputed Facts (Dkt. 130), and

supporting exhibits (Dkts. 132 - 146). Plaintiffs filed a Memorandum in Opposition to Summary

Judgment (Dkt. 149), a Statement of Undisputed Facts (Dkt. 150), and a Memorandum in

Opposition to Defendant's Statement of Undisputed Facts (Dkt. 151).

### PLAINTIFFS' CLAIMS

In their First Amended Complaint, Plaintiffs, All Children's Hospital, Inc. ("ACH"), a

pediatric hospital, and West Coast Neonatology, Inc. ("WCN"), a group of hospital-based

physicians, seek payment of more than $800,000.00 from Defendant Medical Savings Insurance

Company ("Medical Savings"), a health insurer, for medical treatment rendered to the

prematurely born twin children of John Mason, Jr. and Nancy Mason ("the Masons").[1]  Plaintiffs

allege breach of the Masons' insurance policy with Medical Savings (Count I) and they seek a

declaratory judgment as to the existence of insurance coverage under the policy (Count VI).[2]

Plaintiffs sue as assignees of the rights of the Masons, pursuant to the insurance policy.  Medical

Savings asserts that Plaintiffs lack standing to sue and they argue that the Masons' policy was

properly rescinded due to material misrepresentations on the part of Nancy Mason ("Mrs.

Mason") in the health insurance application.  Plaintiffs argue that the insurance application was

not valid from the outset.

## BACKGROUND AND ALLEGATIONS

On March 7, 2001, the Masons executed a health insurance application with Medical

Savings.  The Masons' responses to five questions on the application are at issue in this action.

Specifically, Question No. 3.b. of the application reads:

> 3. Is any applicant currently
>
> ....
>
> b. taken [sic] medication or receiving medical treatment of any kind?  (Answer
> under Health Details, page 2)

The Masons answered "NO" to this question.  Question No. 8.g. reads:

> 8. Has any applicant within the last 10 years had any indication, diagnosis, or
> treatment of any disease or disorder of the:
>
> ....

---

[1]  Plaintiffs Pediatric Physician Services, Inc. and Ambulatory Pediatrics, Inc. accepted offers of settlement from Defendant Medical Savings.  (Dkts. 112 & 113.)  As such, these parties are dismissed from this suit.

[2]  The Court dismissed Counts II, III, IV, and V of the First Amended Complaint on May 12, 2004.  (Dkt. 23)

> g. male or female reproductive organs, prostate problems, irregular menstruation, abnormal pap test?

The Masons answered "NO" to this question as well.  Question 9.c. reads:

> 9. Has any applicant within the past 10 years had any indication, diagnosis or treatment of:
>
> ....
>
> c. any blood abnormalities, including cholesterol or triglyceride abnormalities?

The Masons also answered "NO" to this question.  Question 9.f. reads:

> 9. Has any applicant within the past 10 years had any indication, diagnosis, or treatment of:
>
> ....
>
> f. diabetes, sugar in the urine, blood, thyroid, breast (such as fibrocystic breast disease), or other gland disorders?

The Masons also answered "NO" to this question.  And finally, Question No. 11.c. of the application reads:

> 11. Within the last 5 years, has any applicant:
>
> ....
>
> c. discussed or been advised to have testing, consultations, or surgery that have not been completed?

Once again, the Masons answered the question with "NO." (See Dkt. No. 51, Ex. A, pp. 2-3.)

Directly above their signature, the Masons averred that they "personally completed" their application and that their answers and statements were " true, complete and correctly recorded to the best of [their] knowledge." (See id. at 3.)  The Masons also expressly stated their understanding that their answers were to "form the basis of, and be made a part of, any policy or certificate which may be issued," and that "any incorrect or incomplete information on this application may result in loss of coverage or claim denial ...." (See id.)  Medical Savings asserts

that nothing in the Masons' application put it on notice of any health condition that required

further investigation or that posed an increased risk to the insurer. Therefore, in exchange for

and in reliance on the Masons' application representations, Medical Savings issued health

insurance coverage to the Masons, evidenced by a health insurance policy ("the policy"), with

Mr. Mason being the primary insured. (See id. at Exs. A and AA.)

On December 11, 2001, Mrs. Mason gave birth, at 28 weeks gestation, to twin sons John

Dylan Mason and John Wyatt Mason ("the Twins"). Medical Savings asserts that it did not learn

that Mrs. Mason was pregnant, or that a claim would be made for neonatal healthcare, until after

the birth of the Twins. Medical Savings commenced an investigation of the Masons' claim,

obtaining medical records from Mrs. Masons' doctors, including David Miller and Laurence

Saperstein ("Dr. Saperstein"), and from the Reproductive Medicine Group, doctors Timothy

Yeko ("Dr. Yeko") and Barry Verkauf ("Dr. Verkauf"). From these medical records, Medical

Savings concluded that the Masons provided incorrect and incomplete health insurance

application information.

Medical Savings learned that prior to and on March 7, 2001, Mrs. Mason knew that

she had "amenorrhea," a condition in which a woman has no or infrequent menstrual periods.

(See Dkt. 133, N. Mason Tr., pp. 51 & 59; Dkt. 136, Saperstein Tr., pp. 13-15.)[3] Mrs. Mason

testified that she had only five menstrual periods between 1999 and when she became pregnant in

July 2001. (See Dkt. 133, N. Mason Tr., at 74-75.) Mrs. Mason believed that she had

no menstruation, rather than "irregular" menstruation. Nevertheless, Mrs. Mason also testified

that in March 2001 she knew that women should typically have a menstrual period on a monthly

---

[3]  Citations to deposition transcripts will appear through this Order as "Tr."

basis or close to a monthly basis.  (See id. at 84.)  Medical Savings urges that, at a minimum,

Mrs. Mason knew that her amenorrhea was a disorder.  Plaintiffs suggest that amenorrhea is not

a "disorder" because it is not health threatening or life threatening.  Dr. Yeko testified to adverse

health effects associated with amenorrhea.  (See Dkt. 143, Yeko Tr., at 62-63.)

Dr. Saperstein, a gynecologist, informed Mrs. Mason, during visits in and between 1995

and 1999, that she needed a work-up if she wanted to find the cause of her amenorrhea and that

she needed to see a reproductive endocrinologist "when she was ready to get pregnant."  (See

Dkt. 136, Saperstein Tr., at 19-20.)  Dr. Saperstein's office referred Mrs. Mason to Dr. Verkauf, a

gynecologist with a subspecialty in reproductive endocrinology and fertility.  (See id. at 31; Dkt.

135, Verkauf Tr., at 6 & 12.)  Mrs. Mason initially testified that she visited Dr. Verkauf at The

Reproductive Group for fertility information only.  (See Dkt. 133, N. Mason Tr., at 53-54.)

However, Dr. Verkauf's records and testimony refute this assertion, as Dr. Verkauf actually

provided the following diagnosis, treatment, and consultations regarding Mrs. Mason's infertility

condition:  (1) a January 7, 2000, pelvic sonogram.  (See Dkt. 135, Verkauf Tr., at 25 & Ex. 4);

(2) a January 12, 2000, consultation with both of the Masons, informing Mrs. Mason that she had

hypothalamic amenorrhea, i.e. a failure of stimulation from her central nervous system to her

ovaries.  (See id. at 24-25, 28-32 & Ex. 4); (3) laboratory studies to check hormone levels,

discussed with Mrs. Mason on February 2, 2000.  (See id. at 33 & Ex. 4); (4) a

hysterosalpinogram - an x-ray of the uterus and fallopian tubes with contrast dye injected through

the cervix - performed at Memorial Hospital on March 9, 2000.  (See id. at 36-37 & Ex. 4); (5)

discussion of fertility options, followed by attempts to stimulate Mrs. Mason's body to ovulate,

by administering a drug (hormone) known as clomiphene citrate (and whose proprietary name is

"Clomid"). (See id. at 40-43, 48 & Ex. 4); (6) a May 17, 2000, injection of progesterone oil "to

see if it would cause bleeding as a consequence of stimulation with the Clomid." (See id. at 43-

44 & Ex. 4); (7) the bringing on of bleeding no different than a menstrual period, which was

communicated as a menstrual period to the patient. (See id. at 44-45 &  Ex. 4); (8) an increased

dosage of Clomid, provided on May 25, 2000. (See id. at  44 & Ex. 4);  (9) another injection of

progesterone oil on June 13, 2000, which Mrs. Mason reported as bringing on a menstrual

period. (See at 47-48 & Ex. 4); (10) a July 18, 2000, blood test, to determine Mrs. Mason's

progesterone level. (See id. at 50 & Ex. 4); (11) a July 18, 2000, discussion with Mrs. Mason

about participating in a drug study conducted by Dr. Yeko, who was Dr. Verkauf's colleague at

The Reproductive Medicine Group. (See id. at 49, 51 & Ex. 4).

Dr. Yeko provided diagnosis, treatment, and consultations, consisting of: (1) a July 24,

2000, discussion with Mrs. Mason about her participation in a study looking at new ways to

induce ovulation. (See Dkt. 143, Yeko Tr., at 18-19  & Ex. 3); (2) a discussion in which Mrs.

Mason, "describes having only six periods her entire adult life other than those induced by

progesterone. (See id. at 20 & Ex. 3); (3) a report by Mrs. Mason, to Dr. Yeko, that she had

irregular menstruation. (See id. at 24-25); (4) Mrs. Mason's participation in four "study cycles,

between July 2000 and December 2000, monitored by Dr. Yeko. (See id.) Two of the study

cycles involved hormone use, and two involved November 2000 and December 2000

inseminations, which were each followed by a period. (See id.) Dr. Yeko testified that Mrs.

Mason was "treated during the course of the study to induce ovulation," and that each study cycle

is typically "[a]bout 28 days" long. (See id. at 25-28 & Ex. 3); (5) a prescription for a

gonadotropin or ovulation-inducing hormone known as Repronex that, on January 29, 2001, Mrs.

6

Mason stated that she intended to take.  (See id. at 33-34); (6) Mrs. Mason's receipt of injections

of Repronex, for ten days, from February 26, 2006 through and including March 7, 2001.  (See

Dkt. 135, Verkauf Tr., at 60-64; Dkt. 143, Yeko Tr., at 36, 45-47 & Ex. 3);[4] (7) a thirty minute

consultation on January 29, 2001, in which Dr. Yeko discussed "the options for future fertility

treatment." (See Dkt. 143, Yeko Tr., at 29.)

Dr. Yeko testified as follows regarding the January 29, 2001 consultation, and future

plans by Mrs. Mason:

> Q:  What do you mean when you say she would like to continue with three to
> four more cycles of gonadotropin therapy with intrauterine inseminations?
>
> A:  It means that after we talked about it that that's what we agreed to do, agreed,
> you know, that we would like to do.

(See id. at 30-31 & Ex. 3.)  Since each cycle was typically 28 days in duration, the "three to four

more cycles" of gonadotropin therapy that Mrs. Mason wanted to continue with, as of January

29, 2001, would necessarily have included and extended past the March 7, 2001, date of the

health insurance application.  (See id. at 26.)

Upon learning of Mrs. Mason's undisclosed medical history, Medical Savings

requested that its underwriting consultant, Aaron Good ("Good"), review the medical records of

Mrs. Mason for the ten year period prior to the March 7, 2001, application date, and conduct an

examination to determine whether Medical Savings would have issued the health insurance

policy had the undisclosed information been known to it at the time of application.  After

examining the pre-March 7, 2001, medical records of Mrs. Mason, Good opined that he would

---

[4]  Mrs. Mason remembers that she had to give herself shots, but remembers nothing else. (See Dkt. 133, N. Mason Tr,. at pp. 67-68, 137.)

not have issued insurance coverage to the Masons if he had known of Mrs. Mason's health history on the date of application. (See Dkt. 129, Exs. 1 & 2.)

Good testified that Medical Savings underwriting guidelines call for the rejection of insurance to any applicant who is currently taking fertility drugs or who has undergone fertility treatment within one year prior to application. (See Dkt. 139, Good Tr., at 35-39 & 61-62.) Defendant's President, Randal Suttles ("Suttles"), confirmed this underwriting practice. Suttles noted that since fertility treatment is associated with a higher incidence of premature and multiple births, such treatment increases the risk assumed by the Defendant, which would be contractually compelled to provide coverage for all healthcare rendered to premature and multiple birth children. (See Dkt. 138, Suttles Tr., at 108-109, 119 & 120; Good Tr., at 52-54.)[5] Good also confirmed that disclosure of Mrs. Mason's amenorrhea would have resulted in a declination of coverage by Medical Savings. (See Dkt. 139, Good Tr., at 66-67; Dkt. 129, Affidavit of Good, Ex. 2.)

Medical Savings asserts that because Mrs. Mason's health history was not truthfully and completely disclosed in the Masons' insurance application, and because the non-disclosure was material to the insurer's risk, it sent a May 29, 2002, rescission letter, through its attorney, to the Masons, detailing the basis for its decision and enclosing a full refund of all insurance premiums, administrative fees, and balance of the Masons' medical savings account. (See Dkt. No. 56 at Ex. 1; Dkt. 133, N. Mason Tr., at Ex. 6.) Mrs. Mason cashed the refund checks. (See Dkt. 133, N. Mason Tr., at p. 108.)

---

[5]  Medical Savings' underwriting guidelines have been marked as confidential trade secret. Nevertheless, Good testified that Suttles' April 2001 Underwriting Memorandum sets forth that fertility treatment has always been a basis for rejection of coverage.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact. Fed.R.Civ.P. 56(c).  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) (citation omitted).  On a motion for summary judgment, the court must review the record, and all its inferences, in the light most favorable to the nonmoving party.  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  Having done so, the Court finds that while it disagrees with some of Medical Savings' arguments, Defendant is still entitled to the entry of final summary judgment in its favor.

## DISCUSSION

### Plaintiffs' Standing

Plaintiffs sue as assignees of the rights of the Masons pursuant to the Medical Savings insurance policy.  (See Dkt. 51. Exs. L-1 & L-2.)  Medical Savings argues that they are entitled to summary judgment because Plaintiff do not have standing to bring this action under the assignments.  The Court disagress.  First, Medical Savings argues that there is no proof that it was actually Mr. Mason who signed the assignment forms and takes issue with the fact that the forms are not notarized.  The Court finds a genuine issue here.  Mr. Mason avers that he did indeed sign the assignments and the assignments on their face do not require notarization.  (See Dkt. 149, Ex. 3 & Dkt. 151, Exs. L1 & L2.)

Next, Medical Savings argues that the Masons did not comply with the provision of the insurance policy which requires Medical Savings' prior approval of assignments of benefits to hospitals and healthcare providers.  (See Dkt. No. 51, Ex. A, § 9, p. 41.)  The record shows that

9

neither Plaintiffs nor the Masons ever provided any assignment to Medical Savings for its

approval. Mr. Mason admits that he never obtained  Medical Savings' approval of any

assignment. (See Dkt. 134, J. Mason Tr., at 58-60). Similarly, All Children's Vice President of

Finance, Arnie Stenberg, and Director of Patient Accounts, Robert Rack, have no knowledge of

any written or verbal consent by Medical Savings to assignment of the contract rights of the

Masons. (See Dkt. 140, Stenberg Tr., at 84-85; Dkt. 142, Rack Tr., at 61, 80, & 94.) However,

as Plaintiffs point out, Florida law generally provides for the assignment of insurance benefits to

a third party without the consent of the insurer, in spite of provisions in an insurance policy to the

contrary, after a loss has been incurred.  See 31A Fla. Jur. 2d Insurance § 3176; see also

Professional Consulting Servs., Inc. v. Hartford Life and Accident Ins. Co., 849 So. 2d 446, 447

(Fla. Dist. Ct. App. 2003)(citing Gisela Inv. N.V. v. Liberty Mut. Ins. Co., 452 So. 2d 1056, 1057

(Fla. Dist. Ct. App. 1984)).  While Medical Savings urges that the assignments were made

"before loss," the record shows that Mr. Mason signed the assignments on December 11th & 12th

2001, right after the Twins were born eight weeks premature.  The Master Insurance Policy

provides that a "loss" is "an event for which benefits may be payable under the policy." (See

Dkt. 51, Ex. A, § 2.)  Clearly, the Masons' loss began as soon as the Twins were born requiring

immediate life-saving medical treatment.  Thus, there is a genuine issue as to whether the

assignments are valid due to having been made "after loss."  It is also worth mentioning that the

evidence shows that Medical Savings was aware of the Twins' admissions to the hospital and

even made reference to making payment on the medical providers' claims directly. (See Dkt.

149, Ex. G.)

And, finally, on the issue of Plaintiffs' standing, Medical Savings argues that dismissal of

Plaintiff West Coast Neonatology, Inc., is warranted because it is not identified in either of the

two assignments. However, the Court finds that a genuine issues exists because Mr. Mason

averred that he intended any assignment to cover all of the Masons' health care providers. (See

id. at Ex. E.) Additionally, the assignments were clearly directed to "All Children's Hospital and

ECC [Emergency Care Center] Physicians." (See Dkt. 51, Exs. L-1 & L-2.) The Court's

independent research reveals that the All Children's Health System includes Plaintiff West Coast

Neonatology, Inc.. See All Children's Health System Notice of Privacy Practices, available at

http://www.allkids.org/patient/patientprivacy.htm.

<u>Validity of the Insurance Application and the Requirement of State Approval</u>

Plaintiffs contend that Medical Savings is precluded from rescinding coverage on the

basis of any information in the insurance application because the application was never approved

by the Department of Insurance ("DOI") for the State of Florida. Plaintiffs argue that as a result

the application in its entirety should be nullified and the policy should survive on its own. The

Court disagrees with Plaintiffs' contentions. The Masons executed their first application for

insurance with Defendant on March 7, 2001. At that time, the primary statute governing out-of-

state insurance groups was Section 627.6515, Florida Statutes, which provides as follows:

627.6515  Out-of-state groups.

(1) Any group health insurance policy issued or delivered outside this state under
which a resident of this state is provided coverage shall comply with the
provisions of this part in the same manner as group health policies issued in this
state.

(2) [T]his part does not apply to a group health insurance policy issued or
delivered outside this state under which a resident of this state is provided
coverage if:

11

(a) The policy is issued to an ... association group to cover persons associated in
any other common group, which common group is formed primarily for purposes
other than providing insurance ...;

....

(4) Prior to solicitation in this state, a copy of the master policy and a copy of
the form of the certificate evidencing coverage that will be issued to residents of
this state shall be filed with the department for informational purposes.

Fla. Stat. § 627.6515 (2001).  Plaintiffs acknowledge that Medical Savings is an out-of-state

company issuing out of state insurance to Florida Residents.  In addition, the policy was a group

insurance policy.  (See Dkt. 51, Ex. A.)  Simply put, Medical Savings falls within Section

627.6515 (2) because the policy issued to the Masons is a group policy issued to an association

group to cover persons associated in a common group not otherwise listed in the statute, which

common group is formed primarily for purposes other than providing insurance.

Plaintiffs also rely on Section 627.410, Florida Statutes, in making their argument that the

Medical Savings' insurance application form is invalid for lack of approval.  However, during

the relevant time frame, the last sentence of Section 627.410(1) stated:

627.410 Filing, approval of forms.

(1) [A]s to group insurance policies effectuated and delivered outside this state
but covering persons resident in this state, the group certificates to be delivered or
issued for delivery in this state shall be filed with the department for information
purposes only.

Fla. Stat. § 627.410(1) (2001).  The Master policy for the Masons' insurance was issued out of

the state of Florida, and was delivered out of the State of Florida, in Washington, D.C.  (See Dkt.

138, Ex. 2. Affidavit of Randall E. Suttles.)  Hence, to the extent that a specific sentence in

Section 627.410 "otherwise provides" to out-of-state policies, it is only the above-quoted last

sentence of subsection (1) that is applicable.  An examination of that sentence reveals that it only

12

refers to a required filing of group health insurance certificates, not of applications. An examination of Section 627.6515(4) reveals that it only refers to required filing of group health insurance master policies and certificates, not of applications. The long accepted and basic canon of statutory construction, "expressio unius est exclusio alterius", states that:

> the mention of one thing implies the exclusion of another; expressio unius est exclusio alterius. Hence, where a statute enumerates the things on which it is to operate, or forbids certain things, it is ordinarily to be construed as excluding from its operation all those not expressly mentioned.

Moonlit Waters Apartments, Inc. v. Cauley, 666 So. 2d 898, 900 (Fla. 1996). Under the plain terms of these statutory sections, the Florida Legislature knowingly and intentionally omitted group health insurance applications from any State filing requirement. For out-of-state group policies, the only statutorily required state filing was master policies and group certificates, and only for informational purposes. Further, under the plain terms of these statutory sections, the Florida Legislature knowingly and intentionally omitted any language indicating that the filing is "for approval" by the state and instead used the express language that the filing is "for informational purposes only." Plaintiffs fail to proffer any writings from the DOI which explicitly prohibited Medical Savings from using the application forms that were ultimately completed in the name of the Masons. Plaintiffs rely heavily on the testimony of James Bracher ("Bracher"), a former supervisor with the State of Florida's Office of Insurance Regulation, to show that insurance applications do indeed have to be filed with the State of Florida and that said applications cannot be used if not approved (dkt. 149, exs. AA & BB); however, for the reasons previously stated, this interpretation of the aforementioned statutory sections is inconsistent with the plain language of the statutes and legislative intent, and is not supported by substantial,

13

competent evidence.  See Public Employees Relations Comm'n v. Dade Police Benevolent Ass'n, 467 So. 2d 987, 989 (Fla. 1985).

The sole insurance application deficiency relied on by Plaintiffs in arguing that the application is not valid in Florida or was rejected by the DOI lies in Question 10.  The question asks whether "any applicant within the past 10 years has been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS Related Complex or Condition." (See Dkt. 51. Ex. A, p. 3.)  In particular, Plaintiffs take issue with the "treated for" portion of this inquiry.  The Masons' responses to Question 10 of the application never formed the basis of the Defendant's decision to rescind the insurance policy.[6]  Nevertheless, Plaintiffs argue that Question 10 of the insurance application runs afoul of Section 627.429, Florida Statutes, and renders the application invalid.  The applicable subsections of this statute provide:

> (2) Scope. --
> ....
>
> (b) This section does not prohibit an insurer from contesting a policy or claim to the extent allowed by law.
> ....
>
> (4) Use of medical tests for underwriting. - -
> ....
>
> (e) An insurer may inquire whether a person has been tested positive for exposure to the HIV infection or been diagnosed as having ARC or AIDS caused by the HIV infection or other sickness or condition derived from such infection.  An insurer may not inquire whether the person has been tested for or has received a negative result from a specific test for exposure to the HIV infection or for a sickness or a medical condition derived from such infection.

Fla. Stat. § 627.429 (2001).  Nowhere in these Sections is there any language prohibiting an

---

[6] As previously stated, Defendant identifies as material misrepresentations the responses to application Questions 3.b., 8.g., 9.f., 11.c. and 12 as the basis for its rescission of the policy.

insurer from asking whether an applicant has received treatment for AIDS or for ARC.

Similarly, the DOI documents that Plaintiffs rely upon do not detail any basis for the DOI's prior

position that Section 627.429 bars a question as to treatment for AIDS or ARC.

Conformity and Severability of Insurance Application

There is no genuine issue as to the fact that the plain language of the insurance contract

brings Question 10 into conformity with Florida law.  Section 9 of the policy states:

> CONFORMITY WITH STATE STATUTES:  The *policy* will be interpreted by
> the laws of the state in which it is delivered.  Any part of the *policy* which is in
> conflict with the laws of the state in which it is delivered is changed to confirm to
> the minimum requirements of that state's laws.

(See Dkt. 51, Ex. A, p. 41.)  The insurance contract specifically defines the word "policy," in

Section 2, to include "the attached pages, the applications, and any amendments."  (See id. at 10.)

Hence, the Masons' application is, by definition, a part of the insurance policy and as Medical

Savings correctly sets forth, the clear intent of the policy's conformity provision was to prevent

the very position asserted by the Plaintiffs now -- that a three page application, of 12 or more

questions, should be deemed a nullity for the sake of one mistakenly drafted question.

Therefore, even if Question 10 improperly included the language "or treated for," under the

conformity provision, this language is deleted to bring the question into conformity with the

minimum requirements of the State of Florida.  In fact, the above-quoted "conformity provision"

is consistent with, and favored by Florida law.  For example, Section 627.627 states:

> Conformity with statutes.  The contract may include the following provision:
>
> Conformity with State Statutes: Any provision of this policy which, on its
> effective date, is in conflict with the statutes of the state in which the insured
> resides on such date is hereby amended to conform to the minimum requirements
> of such statutes.

15

Fla. Stat. § 627.627 (2001). The Court agrees with Defendant that by asking that this Court ignore the contract conformity provision, Plaintiffs seek to re-write the insurance policy. This is contrary to the basic tenet of contract law that courts may not "rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." Excelsior Insurance Co. v. Pomona Park Bar & Package Store, 369 So. 2d 938, 942 (Fla. 1979); see also Rigel v. National Cas. Co., 76 So. 2d 285, 286 (Fla. 1954)(holding that courts should not add a meaning to clear contract language).

        Even if there was a genuine issue as to the applicability of the policy's conformity provision, there is no issue that only Question 10 of the application, if improper, should be severed. A bilateral contract is severable under the circumstances at bar, where the alleged illegal portion of the contract does not go to its essence, and where, with the portion eliminated, there still remains of the contract valid legal promises on one side which are wholly supported by valid legal promises on the other. Wilderness Country Club Partnership, Ltd. v. Groves, 458 So. 2d 769, 771-772 (Fla. Dis. Ct. App. 1984).

        Plaintiffs' argument that the entire insurance application should be severed as invalid and that the insurance policy would survive such excision ignores the express intent of Defendant in contracting, the unambiguous language of the insurance contract, and black letter contract law. The policy provides that: "the entire contract between the policyholder and us consists of: (A) the policy; (B) the applications of the policyholder and the persons insured; and (C) the riders issued to certificateholders ...." (See Dkt. 51, Ex. A, § 2, p. 10 & § 9, p. 41.) Moreover, the policy's Group Certificate specifically states: "this certificate is issued in exchange for and on the basis of the statements made on your application." (See Dkt. 51, Ex. A, at 1.) Thus, the

Masons' application representations were not only material contract terms, but valuable consideration that induced Medical Savings to issue insurance to the Masons. (See id. at 1 & 3.) It is impossible to excise the insurance application from the contract without effectively destroying the meeting of the minds at the time of contracting. See Excelsior Insurance, 369 So. 2d at 942; Rigel, 76 So. 2d at 286. The Plaintiffs' own designated expert, Bracher, acknowledged the essential nature of the application when he testified, "I think some application has to be made a part of the policy." (See Dkt. 132 , Bracher Tr., at 75-76.)

Plaintiffs liken the health insurance application in this case to an impermissible policy endorsement which may be severed from a policy without affecting the contract's survival. However, as Medical Savings correctly argues, the analogy is inappropriate because while an endorsement is customarily an offer or agreement by an insurer to modify the terms of the insurance contract coverage in certain specified respects, a health insurance application is the applicant's opportunity to provide critical information necessary for the insurer to determine whether to issue coverage in the first place. Therefore, if an insurer sought to impose an impermissible endorsement on an insured, the Court may, under certain circumstances, sever such an endorsement. However, in a health insurance application, there is no equally compelling basis to "protect" the insured from an overreaching insurer by severing an entire application from the policy, since in the application, the insurer is not imposing coverage terms on the applicant, but is gathering the threshold information to decide whether to issue a policy. In light of all of the foregoing, the Court finds no genuine issue as to the fact that the Masons' insurance policy cannot exist separately from the application.

<u>Additional Challenges to the Validity of the Insurance Application</u>

In their Opposition to Defendant's Summary Judgment Motion, Plaintiffs, for the first time in this case, allege that the agent who signed the subject insurance application form was "not even licensed to sell Medical Savings' health insurance policies at the time he signed the application." Plaintiffs challenge the correctness of the agent's signature and his authority to sell the subject insurance. They annex State of Florida Department of Financial Services records regarding the appointment of insurance agents Dan Patrick and Martin V. ("Van") Patrick. (See Dkt. 149, Ex. F.) Medical Savings argues that Plaintiffs never identified independent agents Dan Patrick or Martin V. ("Van") Patrick as individuals likely to have discoverable information relevant to disputed facts in this case in compliance with Rule 26(a)(1)(A), Federal Rules of Civil Procedure. It also argues that Plaintiffs never identified any of the Exhibit F documents in their Rule 26(a)(1)(B) disclosures. It is clear to the Court that Defendants were never put on notice that Plaintiffs would question the witnessing of the application, otherwise they would have addressed this issue in the instant Motion for Summary Judgment. Accordingly, pursuant to Rule 37(b)(2)(C) and 37(c)(1), Plaintiffs will not be permitted to use Exhibit F as evidence.

Even if the Court were inclined to allow said evidence, the Court agrees with Defendants that Plaintiffs' challenge to the signature of the witness to the Masons' signature on the application is little more than a red herring. The Masons themselves admit to signing the March 7, 2001, application. (See Dkt. 134 , J. Mason Tr. at 27-28; Dkt. No. 133, N. Mason Tr., at 39.) Further, pursuant to Section 627.601(2), Florida Statutes, the statute cited by Plaintiffs as requiring the agent's signature, Section 627.639, does not even apply to Defendant's subject "group" health insurance policy. Therefore, no genuine issue exists as to Plaintiffs' witness-

18

related challenges to the insurance application's validity.

### The "Innocent Co-Insured" Doctrine and Severability of Coverage

Plaintiffs urge that the terms of the policy make clear that the Masons' coverage and the Twins' coverage are severable. Plaintiffs argue that under Florida's "doctrine of the innocent co-insured," an innocent co-insured may recover under an insurance policy, even where the loss was caused by another co-insured's intentional acts, unless the insurance policy at issue is clear that the policy provides for joint coverage, rather than several coverage. Michigan Millers Mut. Ins. Corp. v. Benfield, 140 F.3d 915. 924 (11th Cir. 1984)(citation omitted). However, it appears to the Court, from a review of Plaintiffs' cited case law as well as its own research, that the doctrine specifically applies to fraud in connection with property loss claims, not to misrepresentations in health insurance applications. The Court was unable to locate a single Florida state court or Eleventh Circuit case applying the doctrine to rescission of a health insurance policy.

Furthermore, the policy here is not ambiguous. It clearly provides for joint coverage, rather than several coverage. Under the policy definitions, the Twins are "dependents." not "co-insureds," as Plaintiffs suggest. (See Dkt. 51, Ex. A. § 2, p. 7.) Further, Section 4 of the policy expressly states that eligibility of the primary insured's dependents is "tied to" the primary insured's eligibility and Section 5 provides that coverage of a "dependent" ends on the earlier of: (1) the date when the coverage of the primary insured ends; or (2) the end of the premium period in which the dependent ceases to be the dependent of the primary insured. (See id. at § 4, p. 12 & 5, p. 14.) In addition, the definitions of "eligible child" and "dependent" plainly preclude a child from falling within the policy definition of "dependent," absent the existence of a "primary insured." (See id. at 7, 8, & 10.) This clear policy language conclusively establishes that

dependent coverage under the health insurance contract is not severable from primary insured coverage.

Equally clear is the policy language that "[n]o statement made by an applicant for insurance will be used to void the insurance or reduce the benefits, unless contained in a written application which is signed by the applicant." (See id. at § 9, p. 41) (emphasis added). Medical Savings is correct in its assertion that by explicitly referring to voiding "the insurance," the policy makes it clear that misstatements could result in voiding of the entire insurance policy. The same reference to voiding of "the insurance" is contained two more times within the policy's "Incontestability" provision. (See id.)

Plaintiffs err in seeking support for their argument of several coverage in language from the "Termination for Fraud" section of the policy, which states that coverage of "a covered person" who is knowingly involved in or has knowledge of fraud or material misrepresentation in filing a claim for policy benefits may be terminated." (See id. at § 5, p. 14.) The Court agrees with Defendant that this provision is irrelevant to the rescission in this case. Material misrepresentation in an application for insurance coverage goes to the heart of the existence of the insurance contract and can result in the voiding of a policy from the moment of its creation, completely eliminating the availability of coverage. In contrast, fraud in the filing of a claim for policy benefits does not alter or otherwise affect the prior existence of a valid insurance contract.

Likewise, Plaintiffs err in asserting that section 627.6575, Florida Statutes, mandates insurance coverage for the twin newborns. Plaintiffs correctly state that the statute requires that "the insurance policy that provides coverage for a family member also provide that the health insurance benefits applicable for children will be payable with respect to the newborn child of the

20

certificateholder." However, what Plaintiffs overlook is that the policy here did not provide

coverage for a family member. The effect of Medical Savings' rescission of the contract was to

render the contract issued to the Masons "of no force and effect from the beginning" and thus the

Twins were not newborn children of any certificateholder. See generally, Borck v. Holewinski,

459 So. 2d 405 (Fla. Dist Ct. App. 1984).

Similarly, Plaintiffs err in relying on the "Adding a Newborn," "Extension of Benefits,"

and "Conversion of Privilege" sections of the policy to find coverage for the Twins. These

provisions apply to a "covered person" and thus an "eligible child" defined by the policy as "the

primary insured's natural or adopted child." (See id. at § 2, pp. 7-8, § 5, p. 13, & § 8, pp. 39-

40.) A "primary insured" is defined by the policy as "a member of the policyholder association

who is insured under the policy." (See id. at p.10.) However, Mr. Mason was no longer a

primary insured of the policy because, as stated above, the effect of Medical Savings' rescission

of the Masons' contract was to render the contract issued to the Masons "of no force and effect

from the beginning." Therefore, in light of all the foregoing, there is no genuine issue that when

Medical Savings voided the coverage of the primary insured, it effectively voided the coverage of

the dependent Twins.

Rescission of the Insurance Policy

Medical Savings rescinded the Masons' insurance policy on the basis of material

misrepresentations made in their responses to five questions in the insurance application.

Plaintiffs contend that the Masons did not make any material misrepresentations because the

questions were answered to the best of their knowledge. In William Penn Life Ins. Co of N.Y. v.

Sands, 912 F.2d 1359, 1364 (11th Cir. 1990), the court shifted the focus from a determination of

21

truth or falsity of a response to an inquiry as to whether the applicant believed the statements to be true, based on the applicant's actual knowledge. However, the court also noted that the presence of "knowledge and belief" language in a policy will not insulate an applicant's responses from all review. Id. Therefore, to ensure a meaningful analysis of application representations, the Eleventh Circuit adopted the following test for addressing an applicant's claimed knowledge and belief:

> [t]he twin qualifiers [knowledge and belief] require [ ] that knowledge not defy belief . . . What the applicant in fact believed to be true is the determining factor in judging the truth or falsity of his answer, but only so far as that belief is not clearly contradicted by the factual knowledge on which it is based. In any event, a court may properly find a statement false as a matter of law, however sincerely it may be believed. To conclude otherwise would be to place insurance companies at the mercy of those capable of the most invincible self-deception - - persons who having witnessed the Apollo landing still believe the moon is made of cheese.

Id. at 1365 (citation omitted); see also Hauser v. Life General Security Ins. Co., 56 F.3d 1330 (11th Cir. 1995). Further, where the evidence is clear and uncontradicted, the materiality of a misrepresentation shall be decided as a matter of law. See Continental Assur. Co. v. Carroll, 485 So. 2d 406, 409 (Fla. 1986). The test for determining materiality is whether the same contract would have been executed if the misrepresentation or concealment had not occurred. See Jackson Nat. Life Ins. Co. v. Proper, 760 F. Supp. 901 (M.D. Fla. 1991); Great American Ins. Co. of N.Y. v. Suarez, 109 So. 299 (Fla. 1926); Carter v. United of Omaha Life Ins., 685 So. 2d 2 (Fla. Dist. Ct. App.).

There is no genuine issue that Mrs. Mason made at least one misrepresentation that was material to the risk assumed by Defendant and amounted to grounds for policy rescission. The facts known to Mrs. Mason, as set forth in her testimony, in the medical records, and in the

22

depositions of Mrs. Mason's physicians, flatly contradict the Plaintiffs' claim that "NO" was a true and complete answer to Question 3.b. of the health insurance application which asked whether any applicant was currently taking medication of receiving medical treatment of any kind. On March 7, 2001, Mrs. Mason was indeed taking a prescription medication, and was undergoing medical treatment, as a part of Dr. Yeko's ovulation induction study. The medication was identified by Drs. Verkauf and Yeko as Repronex, a gonadotropin. i.e. a hormone. which was administered by injection.

Further, when questioned at depositions about prescription medications that she took. Mrs. Mason testified as follows:

Q: Back March 7, 2001, would you agree you were taking Synthroid?

A: Yes.

Q: And would you agree that this medication was for a thyroid condition?

A: Yes.

(See Dkt. 133, N. Mason Tr. at 79.)

Q: Back in March of 2001, were you taking anything else by prescription to help you get pregnant or for any other reason?

A: I'm sorry, repeat. I wasn't with you.

Q: Back March 7, 2001, were you taking any other -- any other substances to help you get pregnant or for any other reasons?

A: I don't know about the time line.

MS. ALEXANDER: Object to form.

BY THE DEPONENT: I don't know. I don't recall.

(See Dkt. 133, N. Mason Tr., at 79.)   However, Mrs. Mason's purported lack of memory is

insufficient to contradict the medical records and deposition testimony of her reproductive

endocrinologist-gynecologists, Drs. Verkauf and Yeko, who establish that she was taking a ten-

day course of Repronex injections from February 26, 2001, to and including March 7, 2001 .

(See Dkt. 143, Yeko Tr., at 36, 45-46, &  Ex. 3; Dkt. 135,Verkauf Tr., at 62-64 & Ex. 4.)

>    Mrs. Mason also testified as follows:

>    Q: Then let me further clarify. When a doctor writes you a prescription for
>    medication, not for a chair, for medication. by "medication," I mean
>    something to be taken orally, to be applied to you or to be injected - -

>    A: Okay.

>    Q: -- did you consider that kind of a prescription to be medical treatment?

>    MS. ALEXANDER: Object to the form.

>    BY THE DEPONENT: Yes.

(See Dkt. 133, N. Mason Tr., at 143 (emphasis added).)  The preceding clearly establishes that on

the date of her health insurance application, March 7, 2001, Mrs. Mason knew that she was

currently taking prescription medications, Synthroid and injections ovulation-induction hormone

Repronex, which amounted to "medical treatment" covered by Question 3.b..  Based, in part, on

this information, Medical Savings issued its letter of rescission.  (See Dkt. 56, Ex. 1, pp. 2 - 4.)

During the course of discovery, the Plaintiffs have alternately posited that: (1) Nancy

Mason did not consider it necessary to include fertility treatment as "treatment," since such

treatment was sought voluntarily, rather than as a medical necessity, (i.e. was a "want" rather

than a "need"); or (2) Nancy Mason was justified in her belief that fertility treatment need not be

reported, as fertility treatment was not a covered expense.  Medical Savings correctly asserts that

24

there is no merit to either of these positions. Question 3.b. asks for disclosure of "medical treatment of any kind." (See Dkt. No. 51, Ex. A, p. 2 (emphasis added).) As the Eleventh Circuit has stated, "the adjective 'any' is not ambiguous; it has a well-established meaning." See Merritt v. Dillard Paper Co., 120 F.3d 1181, 1186 (11th Cir. 1997). "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" See United States v. Gonzales, 520 U.S. 1, 5 (1997). There is thus no clearer language available than the words "of any kind" to signify the breadth of the scope of mediation and medical treatment that are the subject of Question 3.b. Therefore, as Defendant correctly argues, the applicant cannot answer truthfully and completely if she unilaterally changes the meaning of the words "medication or receiving treatment of any kind" to be "medication or receiving treatment that is medically necessary." Similarly, nothing in Question 3.b. or elsewhere in the application permits an applicant to restrict disclosure according to his or her own interpretation of what may ultimately be covered under the policy. The language of the insurance application and in the remainder of the policy impose a duty on the applicant to provide answers that are not only true and correctly recorded, but "complete." (See Dkt. No. 51, Ex. A, at 1 & 3.) Nancy Mason was therefore required to identify all medication and all medical treatment and failed to do so. The Court finds, as a matter of law, that Mrs. Mason made misrepresentations in her response to Question 3.b. of the insurance application. Because a single misrepresentation in the insurance application can provide a basis for rescission under Section 9 of the policy, the Court need not address Defendant's arguments with respect to any other responses by the Masons to the application questions.

As to the materiality of Mrs. Mason's misstatements concerning medical treatment, the

evidence shows. with respect to Mrs. Mason's use of Repronex. a gonadotropin or ovulation-inducing hormone, that Medical Savings' underwriting practice has been to refuse to issue insurance to any applicant: (1) who took any fertility drugs within one year prior to the application date; (2) currently receiving fertility treatment; or (3) who has amenorrhea. (See Dkt. 146, Good Tr., at 35-39, 61-62, & 66-67.) Further, an insurer is entitled to rely on the truthfulness of an applicant's statement of medical history and has no duty to make further inquiries. See New York Life Ins. Co. v. Strudel, 243 F. 2d 90 (5th Cir. 1957); Shelby Life Ins. Co. v. Paolasini. 489 So. 2d 89, 91 (Fla. Dist. Ct. App.), rev. denied, 501 So. 2d 1283 (Fla. 1986).

Plaintiffs fail to refute the testimony of underwriting consultant Aaron Good and of Medical Savings President, Randal Suttles, which established that pursuant to its underwriting guidelines, Medical Savings would have refused to issue an insurance policy to the Masons if it had known that Nancy Mason had undergone treatment for infertility within one year prior to the date of the March 7, 2001, health insurance application. (See Dkt. 146, Good Tr., at 35-39 & 61-62; Dkt. 138, Suttles Tr., at 108-109.) Suttles and Good also testified that Medical Savings considers fertility treatment to be associated with a higher risk of multiple births and premature births. (See Good Tr. at 52-53; Suttles Tr. at 108-109 & 119-120.) Since Medical Savings would be contractually responsible for covering healthcare expenses related to such premature births and multiple births, it would be faced with an increased risk assumed if it were to provide coverage to applicants undergoing fertility treatment. (See id.)

After reviewing Mrs. Mason's medical records for the period up to the date of the insurance application, and based on his knowledge of Medical Savings' underwriting guidelines,

26

Good stated that he would have declined coverage. (See Dkt. 129, Ex. 1; Dkt. 146, Good Tr., at

Ex. 2.) Medical Savings, therefore, made a permissible business decision not to assume the

increased risk that would arise from providing coverage to women who have recently undergone

fertility treatment.   In light of the materiality of the Masons' application misrepresentations,

there is no genuine issue that Medical Savings properly rescinded the health insurance policy

issued to the Masons.

**ACCORDINGLY,** it is **ORDERED AND ADJUDGED:**

1. Defendant's Motion for Summary Judgment (dkt. 129 ) is granted.

2. Plaintiffs Pediatric Physician Services, Inc. and Ambulatory Pediatrics, Inc. are

dismissed from this action pursuant to their notices of settlement (Dkts. 112 & 113.)

3. Defendant's Motion to Strike Exhibits (dkt. 152) is denied as moot.

4. The Clerk shall enter final judgment in favor of Defendant and against Plaintiffs All

Children's Hospital and West Coast Neonatology, Inc., terminate any pending motions, and close

this case.

**DONE AND ORDERED** at Tampa, Florida, on August 3, 2005.

RICHARD A. LAZZARA
**UNITED STATES DISTRICT JUDGE**

COPIES FURNISHED TO:
Counsel of Record

27